# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHN EDWARD BURR,       )
                                     )

        Petitioner,       )
                                     )

        v.                    )       1:01CV393
                                     )

GERALD J. BRANKER,[1]     )
Warden, Central Prison,     )
Raleigh, North Carolina,     )
                                     )

        Respondent.     )

FILED
MAY 06 2009
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.
By _____

## ORDER AND SUPPLEMENTAL RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

On December 14, 2004, this Court entered a Recommendation (Docket No. 28) that the habeas corpus petition of John Edward Burr, a North Carolina death row inmate, be granted and that Burr's conviction and death sentence for first-degree murder be vacated without prejudice to his being retried by the State. The undersigned Magistrate Judge found that Petitioner's Sixth Amendment right to effective assistance of trial counsel was violated and that the state court's decision to the contrary constituted an unreasonable application of clearly established federal law. *See generally* 28 U.S.C. § 2254(d)(1) and *Williams v. Taylor*, 529 U.S. 362, 411-13 (2000).

---

[1] Gerald J. Branker succeeded Mr. Marvin Polk as Warden at Central Prison. The case caption is hereby amended to accurately reflect Mr. Branker as the Respondent.

Following entry of the Recommendation, Respondent ("the State") filed objections (Docket No. 32) and the parties filed additional motions (Docket Nos. 32-34, 41). The State moved to hold the Recommendation in abeyance, to expand the record, and to quash the affidavit of one of Petitioner's expert witnesses, Dr. Colin R. Paterson. Petitioner Burr moved for leave to conduct discovery.

On February 1, 2006, the undersigned entered an order staying the Recommendation and permitting expansion of the record, including identification and discovery of additional experts. (Docket No. 68.) The Court found that newly-submitted information that the medical license of Dr. Paterson had been revoked would cause the Court, at the very least, to afford his opinion considerably less weight than previously assigned in the Recommendation. The Court gave Petitioner and the State an opportunity to develop other expert testimony, and allowed the parties cross-discovery regarding their medical experts. Finally, the Court ordered that after discovery the parties should file supplemental briefs on Petitioner's habeas corpus petition.[2] This opinion constitutes the Supplemental Recommendation based upon the newly-expanded record.

---

[2] The Court created a schedule for discovery and briefing. That schedule was significantly extended when attorney J. Kirk Osborn, original lead attorney for Petitioner, tragically died of a heart attack. Final briefing on the petition, as supplemented under the February 1, 2006 Order, was completed on August 22, 2007.

-2-

## Re-entry and Incorporation of Prior Recommendation

The Court hereby re-enters and incorporates its Recommendation of December 14, 2004, except as to its discussion of the affidavit of Dr. Paterson. The Court continues to find and conclude, on the expanded record before it, that Petitioner Burr's Sixth Amendment right to effective assistance of counsel was abridged at trial, and that the state courts unreasonably applied the law of the Supreme Court of the United States in denying Petitioner's challenge to his conviction. The Recommendation of December 14, 2004, is supplemented by this opinion which discusses evidence newly added to the record. The Recommendation of December 14, 2004 is re-entered with this Supplemental Recommendation and is attached hereto as Attachment A.

## Deficient Performance by Defense Counsel

The original Recommendation describes in detail the failure of Petitioner Burr's trial counsel to investigate and prepare a defense based upon testimonial and medical evidence tending to show that the fatal head injury incurred by infant Tarissa Sue O'Daniel ("Susie") was caused accidentally and was not the result of intentional child abuse and murder by Petitioner. The Court found, consistent with *Wiggins v. Smith*, 539 U.S. 510 (2003), that Petitioner Burr's counsel had failed in their duty to investigate a significant defense which was available to Petitioner. The Court did not read *Wiggins* to extend or change the law with regard to Sixth Amendment ineffective assistance of counsel as announced in *Strickland v.*

*Washington*, 466 U.S. 668 (1984); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005).

Rather, *Wiggins* merely represents a specific application of the *Strickland* standard.[3]

Nothing in the expanded record or supplemental briefing now before the Court alters the Court's assessment that defense counsels' performance was deficient to a constitutional level for failing to investigate the medical and factual evidence in this case in order to develop a defense of accidental death. As noted in the Recommendation, counsel knew that the State would rely upon a complex medical record and expert testimony to attempt to establish that the infant was intentionally murdered. The medical evidence was crucial, as there were no witnesses to any violent action by Petitioner Burr directed toward the infant on the date of her fatal head injury. Nonetheless, defense counsel spent less than 10 hours in preparation on the medical issues.

The expansion of the record and the identification of experts permitted by the Court after entry of the Recommendation produced evidence that is relevant primarily to the prejudice prong of the two-part *Strickland* Sixth Amendment test, not to the performance-of-counsel prong. Nonetheless, one or two additional matters regarding the performance of counsel should be noted at this time.

---

[3] A careful reading of *Wiggins* reveals that the Supreme Court looked to *Strickland* while analyzing whether trial counsel performed an adequate investigation in preparing for the penalty phase of Wiggins' trial. *Wiggins* clearly holds that it is not making "new law" regarding the standard for ineffective assistance of counsel claims. 539 U.S. at 522. Rather, the Supreme Court, in applying *Strickland*, held that it is constitutionally ineffective for counsel not to investigate and introduce mitigating evidence of a defendant's social history and background.

The case against Petitioner Burr was circumstantial; there were no witnesses to any alleged abuse or use of violence by Petitioner against Susie on August 24, 1991. The State relied almost entirely on the testimony of five doctors whose testimony went unchallenged by Petitioner's attorneys. The State may have expected that Petitioner would dispute the cause of the victim's death, but that, in fact, never happened. As noted in the original Recommendation, defense counsel spent less than ten hours reviewing the medical evidence and preparing for cross-examination of the medical experts. Having no other knowledge or expert testimony, defense counsel were left with no choice but to accept as true the State's theory that Susie was the victim of an intentional blow to the head that resulted in her death.

It is well-documented in the medical records and the statements of witnesses that the four-month-old infant victim in this case, Susie O'Daniel, suffered an accidental fall with her eight-year-old brother, Scott Ingle, some six hours before she was taken to the hospital in the nighttime hours of August 24-25, 1991. She died several days later of a closed head injury. There is considerable dispute in the expanded record now before the Court about the *seriousness* of this fall and, in fact, whether it caused, or could have caused, Susie's subsequent death. This issue was the subject of most of the post-recommendation discovery of experts conducted by the parties. What is important for this Court's *Strickland* analysis is that Petitioner's trial counsel failed to recognize the need to develop evidence regarding the nature and consequences of Susie's fall. In fact, defense counsel, in closing argument to the jury, ended up conceding that Susie's fall did not cause her death, an incompetent act by

-5-

counsel in view of evidence to the contrary which they could have developed. (*See* Trial Tr. Vol. 27, at 2126.)

The testimony of the State's witnesses, as actually presented at Petitioner's trial, did not describe a particularly significant fall suffered by the infant near the time of her death. But there was *other* evidence regarding the fall that could have been, and should have been, developed by counsel to persuade the jury that Susie O'Daniel in fact suffered a damaging accidental fall, wholly unrelated to Petitioner, on the evening of August 24, 1991. The notes of the investigating police officers, and other contemporaneous notes, reveal that from the time Susie was first transported to the hospital, Lisa O'Daniel, Susie's mother, and Scott Ingle reported that young Scott had fallen to the ground with Susie in his arms only hours before. During the initial course of the investigation, both Ms. O'Daniel and Scott told Captain Dan Qualls and Detective Roney Allen that Susie was injured when Scott dropped her and fell on top of her. Almost all of the medical records, especially the treatment notes, also include a narrative describing a serious fall suffered by Susie. Trial counsel failed to investigate this medical evidence contained in the prosecutor's file and in the records available from the hospitals where Susie was treated.

Descriptions by the State's witnesses of Susie's fall changed materially between August 1991 and the time of trial in early March 1993. On August 25, 1991, Ms. O'Daniel was interviewed by Juanita Todd, a social worker who was called in to investigate Susie's injuries. Ms. O'Daniel's description of the fall in this interview was simply that "[Scott]

tripped, dropped the baby and fell on her." (Record Sheet, The North Carolina Memorial Hospital, "Social Work" entry of August 25, 1991.) She gave a similar account to Detective Allen on August 26, 1991, describing the fall in the following way when asked if she had actually seen the fall: "No, when I turned around, I heard him holler, and when I turned around, he was lying on top of her." (Trial Tr. Vol. 23, at 1525.) To Captain Qualls, she stated on August 26, 1991: "I heard [Scott] fall and when I turned around, he was laying on top of [Susie]," but she stated that the baby did not fall out of Scott's arms. The baby was "crying out real hard." (Trial Tr. Vol. 18, at 389-90.) According to the statement she gave to Captain Qualls, nearly contemporaneous with the events in question, the baby's arm was "red, real red," the baby was "shaking," and the left arm "jerked a whole lot." (*Id.* at 398-400.) The baby cried for "probably about an hour and a half." (*Id.* at 400.) An interview account by Elbert Porter, maternal grandfather to Susie, on August 25, 1991, provided that Porter saw the baby about one hour after her fall with Scott and observed that "the child was not as responsive as normally but he gave it little thought at the time." (Record Sheet, N.C. Mem. Hosp. "Social Work" entry of Aug. 25, 1991.) Clearly, these statements of witnesses all described both a dangerous fall and a serious injury to the child.

By the time of trial, however, Ms. O'Daniel described the fall and its effects on the baby quite differently. She testified that Scott neither dropped Susie nor fell on top of her, and "his arms took most of the fall." (Trial Tr. Vol. 17, at 122.) Ms. O'Daniel testified that she checked the baby and the back of the baby's head after the fall. The baby was "a little

-7-

bit red, but it went away." The baby "cried a little while" after the fall, "hard" when she first fell. (*Id.* at 124-25). "It took a few minutes" to settle Susie down. When asked if Susie was doing anything else, Ms. O'Daniel testified that "[s]he was fine." (*Id.* at 125-26.) The central theme of her testimony was that Susie did not suffer a hard fall and showed no signs of significant injury.

There was evidence admitted at trial that during Captain Qualls' interview with Lisa O'Daniel, Ms. O'Daniel stated with regard to the fall that she turned and saw Scott "laying on top of [Susie]." Captain Qualls immediately followed with a leading question: "Was he laying on top of her or was he cradling her in his arms still, and at this falling, holding the child in a, you know, protecting the child from the fall . . . ." (Trial Tr. Vol. 18, at 389.) By the time of trial, the fall came to be routinely described as a "cradled" fall.

Eight-year-old Scott Ingle originally told Detective Allen on September 5, 1991, two weeks after the incident, that Susie "fell out of [his] arms," she hit the ground first, and then he fell on top of her. (Trial Tr. Vol. 23, at 1535-36, 1584.) By the time of trial, however, Scott testified that he only fell to his knees, not all the way to the ground, and Susie did not fall out of his arms. (Trial Tr. Vol. 20, at 868.) Once again, the trial testimony showed only a minimal fall with little-to-no impact upon Susie.

Had counsel recognized the significance of the initial statements of Scott and Ms. O'Daniel, tending to show a serious fall resulting in trauma to Susie's head, a reasonable investigation would have revealed the DSS reports in the medical records containing other

early statements about the fall, and counsel would have recognized that the accounts of the incident by the State's witnesses changed dramatically over time as trial approached. Defense counsel did not develop evidence regarding the seriousness of Scott's fall with Susie because they did not understand its significance. Had counsel developed this evidence, they would have been able to frame a substantial defense based upon Susie's accidental fall and medical testimony concerning the cause of Susie's death.

A determination of the reasonableness of counsel's actions must be made on a "case-by-case" basis. *Williams*, 529 U.S. at 391. "A standard of reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules," and the merits of counsel's investigative choices may often be "subject to fair debate." *Rompilla*, 545 U.S. at 381. Courts throughout the country, however, have long found defense counsel's performance to be deficient where counsel failed to investigate possible defenses and to interview witnesses who could have supported the only defense available. *See, e.g., United States ex rel Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir. 1984), *overruled on other grounds by United States v. Payne*, 741 F.2d 887 (7th Cir. 1984) (finding deficient performance and prejudice where counsel failed to investigate and interview witnesses who could have supported only available defense to charges); *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006) (finding deficient performance and prejudice where counsel failed to investigate and call additional witnesses who could have corroborated the testimony of the single alibi witness).

Counsel has an obligation to conduct a reasonable investigation or to make a reasonable decision that further investigation is unnecessary. *Strickland*, 466 U.S. at 691. "[W]here counsel fails to investigate and interview promising witnesses, and therefore 'ha[s] no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate*, 957 F.2d 1339, 1345-46 (6th Cir. 1992) (citing *Wolff*, 727 F.3d at 658 n.3). Failure to secure expert assistance can also constitute ineffective assistance of counsel. The Fourth Circuit has recognized a right to expert assistance when "'a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance.'" *Smith v. Angelone*, 111 F.3d 1126, 1132 (4th Cir. 1997) (citing *Williams v. Martin*, 618 F.2d 1021, 1026 (4th Cir. 1980)).

The United States Supreme Court and other federal courts have relied upon the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines") which were originally drafted in 1989 and revised in 2003 as "guides to determining what is reasonable" in representing defendants in capital cases. *See Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 524. Those Guidelines, at the time of Petitioner's trial, imposed clear obligations for defense counsel:

> A.    Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.
>
>    . . . . .

D.    Sources of investigative information may include the following:

7.    <u>Expert Assistance</u>:

Counsel should secure the assistance of experts where it is necessary or appropriate for

(A)    preparation of the defense;

(B)    adequate understanding of the prosecution's case;

(C)    rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial.

1989 ABA Guidelines § 11.4.1, superseded by ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 4.1 Commentary (rev. ed. 2003). The ABA Guidelines merely reflect the very real difference between death penalty cases and other criminal cases where the sentence is less than death. As explained by the Supreme Court: "The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense . . . [as the pre-1989 ABA Standards] describes the obligation in terms no one could misunderstand in the circumstances of a case like this one." *Rompilla*, 545 U.S. at 387; *but see Yarbrough v. Johnson*, 520 F.3d 329, 339 (4th Cir.), *cert. denied*, ___ U.S. ___, 128 S. Ct. 2993 (2008) ("While the ABA Guidelines provide noble standards for legal representation in capital cases and are intended to improve that representation, they nevertheless can only be considered as part of the overall calculus of whether counsel's representation falls below an objective standard of reasonableness; they still serve only as guides, not minimum constitutional standards.").

-11-

The State maintains that defense counsel met their obligation to investigate possible defenses by reviewing Susie's medical records and meeting with Dr. Desmond Runyan on March 19, 1993. As noted by the State, counsels' fee applications show that the two attorneys spent a total of 5.7 hours reviewing the medical records. It is apparent, however, that five or six hours, in a death penalty case such as this one, involving extensive medical records and complex medical issues, constitutes precious little time for preparation. In many ways, as this Court noted in its first Recommendation, counsels' hands were tied by the extreme lack of time they were given to prepare for trial. However, they met with only one of the State's potential medical witnesses, Dr. Runyan, and that meeting was on the very eve of trial. Dr. Runyan, who was the Director of the Child Medical Evaluation Program (CME), had been called in to consult with Susie's treating physicians. Dr. Runyan's treatment notes at the time indicate that Susie suffered from a depressed left temporal skull fracture, which was in fact apparently contradicted by the autopsy report which showed no skull fracture. Trial counsel appeared to be unaware that Dr. Runyan's conclusion on this point was different from that of Dr. Karen E. Chancellor, who performed the autopsy. Trial counsel had not recognized the evidence of a serious fall by Susie that could account for her head injury. The meeting with Dr. Runyan, therefore, could not have been very productive or beneficial to Petitioner.

This case did not involve a situation where counsels' investigation was hampered by the defendant's failure to provide information to counsel or defendant's direction to forego

-12-

investigation. *See Strickland*, 466 U.S. at 691. The information not discovered or followed up on by counsel was beyond the realm of information in the possession of Petitioner. Trial counsel did not meet with any of the other treating physicians or the medical examiner, most of whom were located in Chapel Hill. There was no tactical decision made by counsel to forego an accidental death defense, to not interview witnesses or prepare more thoroughly; they simply did not have the time, the insight, or the experience necessary to do so. Counsel did not secure the services of an expert who could have helped counsel question the State's experts and whose testimony could have raised a reasonable doubt concerning the cause of Susie's death. Petitioner thus was deprived of the opportunity to present an effective defense. As such, counsels' conduct fell far below an objective standard of reasonableness, as defined by *Strickland*, *Wiggins*, and the *1989 Guidelines*, which were the then-prevailing norms of attorney conduct. As found in the original Recommendation, to the extent that the MAR court concluded that counsels' conduct was acceptable, its justifications rested on unreasonable applications of *Strickland*. *See Williams*, 529 U.S. at 387 ("Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law as determined by the Supreme Court of the United States that prevails.") (Internal quotation marks and citations omitted).

-13-

## Prejudice to Petitioner

Under *Strickland*, of course, deficient performance by counsel is not enough to warrant the grant of a writ of habeas corpus; a petitioner must also show that counsel's deficient performance prejudiced his defense to the extent that a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. "[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced." *Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996). In addition, the petitioner must show that "the result of the proceeding was fundamentally unfair or unreliable." *Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998)(citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

Petitioner argues that in discovery in this habeas action he developed persuasive medical evidence that Susie's fatal head injury could have been caused by the accidental fall that occurred hours before Susie was taken to the hospital. Petitioner contends that had this evidence been presented at trial, it would have provided a complete defense to the capital murder charge for which he was prosecuted. The state MAR court summarily dealt with the prejudice issue, in a 116-page Order, stating only: "[I]n the Court's opinion, defendant proffers nothing demonstrating that his trial was fundamentally unfair or that the results are unreliable as a result of trial counsel's performance." (MAR Order I at 76.)

-14-

All experts for the State and for Petitioner in this habeas proceeding agree that the cause of Susie's death was blunt force head trauma. At trial, the State presented five medical experts who testified about Susie's injuries and her medical treatment. It is clear from their testimony that these doctors, who either treated Susie or examined her, firmly concluded that Susie was the victim of a long-standing pattern of intentional child abuse and that she died from a blow to the head. Importantly, there was unmistakable evidence that Susie had been severely abused *in the weeks before* her head injury. There was evidence that both Susie's arms and legs were broken. These injuries, in combination with the head injury, led Dr. David F. Merten to conclude that Susie was a "battered child." (Trial Tr. Vol. 20, at 845.) Three or four of the fractures, however, *had already begun to heal by the time of the child's death*, leading Dr. Merten to the conclusion that these fractures were eight to nine days old. (*Id.* at 840.) It was the State's contention at trial that Petitioner Burr was the person who abused Susie over the last several weeks of her life and then beat her about the head on August 24, leading to her death from a closed-head injury.

In post-trial discovery, on the other hand, Petitioner Burr developed competent evidence that Susie's head injury was entirely consistent with a fall from a height of two-to-three feet onto a gravel surface, with the backside of her skull hitting the ground. (Docket No. 90, State's Dep. Exs., Ex 9, Dr. John Plunkett report at 2.) Thus, while competent counsel for Petitioner at trial would have conceded that there was a pattern of abuse of Susie that caused severe injuries to her long before her death, they would also have presented

-15-

evidence that the actual mechanism of her death was an accidental fall. Further, in briefing to this Court, Petitioner presents argument and evidence tending to show that competent counsel could have effectively impeached the two slender lines of testimony, discussed below, that the State relied on to identify Petitioner Burr as the person who had abused Susie in the weeks before her head injury.

Counsel's failure to obtain or consult an expert witness is prejudicial when expert testimony is so critical to the petitioner's conviction that there is a reasonable likelihood that testimony from a defense expert would have changed the outcome of the case. *See Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also Dugas v. Coplan*, 428 F.3d 317, 334-41 (1st Cir. 2005) (finding that counsel's failure to consult with an expert may be prejudicial when case against petitioner lacks eyewitness testimony and rests mainly on questionable expert testimony); *Ashker v. Class*, 152 F.3d 863, 876 (8th Cir. 1998) (holding habeas petitioner was not prejudiced by counsel's failure to obtain an expert witness where petitioner made no showing that testimony from an expert would have exculpated him); *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (noting "that it should have been obvious to a competent lawyer that the assistance of an accountant [was] necessary" as part of pre-trial defense of complex fraud case).

Because the expert testimony is critical in this case, it is important to examine the basic substance of what the experts for Petitioner and for the State have said. All the experts agree that the cause of Susie's death was head trauma. No expert testified on behalf of

Petitioner at trial. In discovery in this action, however, Petitioner developed the testimony of three experts: Dr. Robert L. West, Dr. John Plunkett, and Dr. Kirk L. Thibault. Dr. West, a pathologist, reviewed Susie's medical records, submitted a report, and later testified in a deposition. He noted that Susie died of traumatic injuries to the head, but opined that "all the recent injuries to the child which are noted by the pathologist at autopsy could have been a result of being dropped by her sibling who then tripped and fell on to her." (Docket No. 90, Ex. 7, Dr. Robert L. West report at 2.) Dr. West went on to state: "It is my further opinion that all the injuries to the child which show evidence of healing could have been caused by someone dropping the child. A bio-mechanical engineer, who can determine the forces involved in such a fall, should review the case and also render an opinion." (*Id.*)

Dr. Plunkett, a board-certified forensic pathologist, also submitted a report and testified by deposition. Dr. Plunkett reviewed the medical records, autopsy report, affidavits of other experts and transcript of an interview that was conducted with Scott Ingle on September 5, 1991. (*Id.*, Ex. 9, Plunkett report at 2). Dr. Plunkett noted that "[a]n impact to the left occipital portion of Susie's scalp and skull caused her death." (*Id*). Dr. Plunkett also noted that the autopsy report did not show a skull fracture.[4] Dr. Plunkett further stated:

> Any head impact in a four-month old infant resulting in inbending of the skull and/or differential acceleration of the brain relative to the scalp and skull is potentially catastrophic. Dropping a 4-month-old infant onto a gravel surface

---

[4] According to Dr. Plunkett, the autopsy is considered "the Gold Standard." (Docket No. 90, Ex. 9, Plunkett report at 2; Docket No. 104, Plunkett Dep. at 42.)

from a height of three feet, with impact to the left back side of the head, will exceed known thresholds for significant brain injury.

. . . .

In summary, Susie's injuries are consistent with those that may occur if an older child tripped while carrying her, then dropped her 2-3 feet onto a gravel surface, with the backside portion of her skull striking the ground. The injury potential increases if the older child fell on her after dropping her. It is possible, if not likely, that she had a lucid interval following the impact injury. Since her injuries are consistent with the witnessed event involving Scott on August 24, it is unreasonable and scientifically unnecessary to propose a subsequent unwitnessed assault by [Petitioner] as the cause of her injury and death.

(*Id.* at 2-3.) The concept of a lucid interval, that is, a period of time between an injury and the manifestation of symptoms from that injury, was the subject of much discussion by the experts. In his deposition, Dr. Plunkett expounded on his theory: "Tarissa Sue's injury is, in fact, brain swelling. The onset of brain swelling is variable. It is not surprising at all that she would have some period of time in which she appeared to be normal prior to the point where her brainstem center [which] is controlling breathing are damaged or compromised." (Plunkett Dep. at 61.)

Dr. Thibault, a biomechanical engineer who is not a medical doctor, also provided testimony for Petitioner. According to Dr. Thibault,

The study of the biomechanics of human injury is a widely recognized, well-established branch of science dedicated to elucidating the mechanisms of human injury. This serves two purposes: (1) Determining quantitatively the thresholds at which injury to the human body occurs in order to develop improved strategies for injury control, and (2) to understand the injury at the tissue and cellular level as well as the systemic level in order to develop new approaches for therapeutic intervention. . . .

-18-

While clinicians are trained to examine, diagnose and treat injury, the biomechanical engineer seeks to determine the mechanism of a particular injury through application of formal training in engineering, life sciences, advanced mathematics, and physics.

(Docket No. 90, State's Dep. Exs., Ex. 8, Dr. Kirk L. Thibault report at 2-3.) Dr. Thibault went on to review the evidence in this case to determine whether a fall, as described in some statements by witnesses and taking into account the statistical range of stature and weight for an eight-year-old child, could account for the head trauma suffered by Susie. He concluded:

In summary, the head injuries sustained by [Susie] are consistent with the given medical history of being carried by a sibling while the sibling fell to the ground and on top of the infant. These injuries are not sensitive to intent, and therefore may be the result of accidental or non-accidental trauma, so long as the loading condition to which the child is exposed is sufficient to exceed the tolerance of the various anatomy to injury. The estimates of head loading are based on the laws of physics and are consistent with experimental testing and published literature regarding impact loads to infants and young children.

(*Id.* at 7.)

The State also put forward the testimony of experts, both at trial and in post-conviction discovery. Most of these expert witnesses were treating physicians who were involved in the medical treatment of Susie: Dr. Richard G. Azizkhan, a pediatric surgeon; Dr. David F. Merten, a pediatric radiologist; Dr. Michael Tennison, a pediatric neurologist; Dr. Karen Chancellor, a medical examiner who performed the autopsy on Susie; and Dr. Barbara Specter, a radiologist. Dr. Desmond Runyan, a pediatrician who evaluated Susie in the hospital and gave a report to the Department of Social Services, did not testify at trial but did testify in a post-trial deposition.

-19-

Dr. Azizkhan, who was the chief of pediatric surgery at UNC and treated Susie, testified at trial and in deposition that he had never seen a clearer case of child abuse. (Docket No. 98, Azizkhan Dep. at 85.) He noted that Susie had lost a significant amount of blood, all internally, into the fracture sites in her arms and legs (*id.* at 14), but he stated that the most significant injury to Susie was her traumatic brain injury. It was Dr. Azizkhan's opinion that Susie had a depressed left temporal skull fracture, as seen on a CT scan, though he acknowledged that the autopsy report did not show a skull fracture. (*Id.* at 35.) He also testified that in his opinion, based on the severity of the brain injury, Susie would have lost consciousness soon after the injury, and that the window for a lucid interval would have been fairly short.[5] (*Id.* at 53-54.) Dr. Azizkhan testified that Susie's leg fractures were a result of a direct blow or a snapping of her leg bones, and that such injuries "are generally not accidental." (*Id.* at 59.) In his deposition, Dr. Azizkhan conceded that a fall of 24 inches could cause a depressed skull fracture if "the circumstances are correct and [depending on] the way the child falls and on what the child falls on." (*Id.* at 46-47.) Dr. Azizkhan testified that he was never contacted by Petitioner's trial counsel. (*Id.* at 11.)

Dr. Merten, the pediatric radiologist who read Susie's x-ray films, also testified as an expert witness for the State. At trial, Dr. Merten testified that the fractures and head injury

---

[5] There is in the record an interview by social worker Juanita Todd with Susie's maternal grandfather, who saw Susie one hour after her fall. He told Ms. Todd that Susie was not "normally responsive," although he didn't think much of it at the time. The record also suggests that Susie slept for many of the remaining hours before she was found to be unresponsive around midnight on the night of August 24, 1991.

-20-

suffered by Susie could not have occurred in the fall with Scott, *as that fall had been described to him*, although Dr. Merten admittedly did not speak with any witnesses to the fall. Dr. Merten based his opinion on testimony of witnesses and the fact that Susie had "a lucid interval of normal behavior of approximately 6-7 hours from the time of the [fall] and . . . when Susie was found unresponsive with multiple bruises on her head, neck, ears and extremities." (Docket No. 90, State's Dep. Exs., Ex. 1, Dr. David F. Merten Aff. at 2.) Dr. Merten also noted that "[t]here were multiple fresh bruises on the head and neck, torso and extremities not present on 24 August 1991, with the bruises on her cheek suggesting fingerprints and those on her neck consistent with a handprint. There were no signs of cutting, scraping, tearing, or any form of external injury other than the bruises." (*Id.*) Additionally, Dr. Merten stated that the "[f]ractures of the skull, arms and legs" could not have happened in the fall with Scott. (*Id.*) Dr. Merten testified that he concluded that Susie was a victim of child abuse before he ever talked with any law enforcement officers about the case. (Docket No. 101, Merten Dep. at 85.) He also testified that he was never contacted prior to trial by Petitioner's attorneys. (*Id.* at 16-17.)

Dr. Michael Tennison, the treating pediatric neurologist, testified for the State. He stated that at the time he treated Susie, he considered "a wide variety of possible diagnoses." (Docket No. 90, State's Dep. Exs., Ex. 3, Dr. Michael Tennison Aff. at 2.) Dr. Tennison noted that he had "never seen a case that was more clear cut for non-accidental trauma. The diagnosis was absolutely compelling and nothing else including the statistically exceedingly

-21-

unlikely combination of delayed brain edema and OI [osteogenesis imperfecta] could possibly account for the child's combination of findings." (*Id.*) Dr. Tennison stated in his affidavit that "there was a fracture present that resulted from an intense force leading to asymmetrical swelling of the brain with very rapid progression to death. The trauma necessary to produce the depressed fracture would have rendered the patient quickly unconscious and there would not have been a completely normal lucid interval." (*Id.* at 3.) In his deposition, however, when Dr. Tennison was informed that Susie's mother had told Detective Allen that it had taken over an hour and a half to calm Susie down after the fall with Scott, Dr. Tennison acknowledged that one and a half hours would be "a long time to calm a child down." (Docket No. 99, Tennison Dep. at 38.) Dr. Tennison conceded that it was "theoretically possible" that Susie could have suffered a depressed skull fracture in a three-foot fall in her brother's arms where the brother fell on top of her. (*Id.* at 69-70.)

Dr. Runyan was the on-call child abuse consultant the night that Susie was brought into the UNC hospital. He examined Susie and in his deposition he testified that, in his opinion, the fall with Scott was inadequate to explain the serious injuries suffered by Susie. (Docket No. 100, Runyan Dep. at 21.) He based this opinion in part on the record and the history given by the family, and the assumption that "Susie did not hit the ground when the purported fall took place." (Docket No. 90, State's Dep. Exs., Ex. 2, Runyan Aff. at 1.) Dr. Runyan noted in Susie's medical record at the time that he viewed Scott as a "scapegoat." (Runyan Dep. at 20, 26-27.) Dr. Runyan also noted that, in his opinion, Susie's leg and

-22-

shoulder fractures preceded her head injury by a week. (*Id*. at 21.) In his affidavit, Dr. Runyan summarized his opinion:

> In my medical opinion, there is no reasonable evidence to support the diagnosis of OI or the theory that there is an entity or diagnosis known as Temporary Brittle Bone Disease. This purported condition has never been validated in the medical literature with any clinical, epidemiological, or biochemical evidence and this theory has been raised sufficiently often that there has been plenty of time an[d] opportunity for the scientific community to explore the existence of this entity.
>
> I have carefully reviewed the autopsy and the other materials from the trial and in my medical opinion, there is no alternative explanation for the injuries to Susie other than physical abuse.

(Runyan Aff. at 2.)

Dr. Karen Chancellor, the forensic pathologist who performed the autopsy on Susie, also testified, both at trial and in a post-trial deposition. Dr. Chancellor testified that all of the fractures of Susie's extremities could not have happened in a fall, opining that Susie suffered at least two separate episodes of trauma. (Docket No. 97, Chancellor Dep. at 19-20.) Dr. Chancellor found that Susie did not have a skull fracture. (*Id*. at 30.) In her affidavit, Dr. Chancellor stated her opinion that:

> Susie's death resulted from blunt force injuries to the head. These injuries were evidenced by bruising in the scalp, acute subdural hemorrhage over the left cerebral hemisphere, acute subarachnoid hemorrhage over the left hemisphere, multiple retinal hemorrhages involving right and left eyes, and left optic nerve sheath hemorrhage. The traumatic head injury was the result of either an object(s) impacting the head, or the head impacting blunt object(s). Whether or not shaking contributed to this injury, cannot be determined. The multiplicity of bruises on the head and neck argue strongly against any accidental mechanism of injury.

-23-

Also present were bruises on the neck and chest. The configuration of bruises on the neck and jaw (large bruise on the left side of the neck underneath the jaw and smaller bruises on the right side of the neck and jaw) are extremely suggestive of and consistent with a hand held across the neck and jaw causing these injuries and consequently compressing the neck.

Injuries to the extremities were present and may have contributed to death. There were fractures of both legs (femoral fractures) and both arms (humeral fractures), with some of these fractures indicating evidence of healing by radiography. Other fractures demonstrated no evidence of healing, indicating at least two episodes of traumatic injury to the extremities. The mechanism of these fractures was violent bending, blunt force, violent shaking or some combination thereof.

The constellation of injuries in this child is entirely inconsistent with those injuries being sustained during a simple fall. Indeed, there is nothing to indicate that these fractures were sustained in an accidental manner. A child of this age is unable to sustain serious injuries, such as these, on her own. It is difficult to conceive of an accidental mechanism that could explain these traumatic findings. These injuries are the result of trauma inflicted by other(s).

(Docket No. 90, State's Dep. Exs., Ex. 5, Chancellor Aff. at 2-3.)

Dr. Barbara Specter, a pediatric radiologist, also testified by affidavit and deposition for the State. Dr. Specter reviewed the medical records, reports, x-rays, and the testimony of other witnesses. Although Dr. Specter did not testify at the original trial, she testified in her deposition that in 1991 she had reviewed some of the x-ray films that were performed on Susie. Prior to the 1993 trial, however, she was never contacted by defense attorneys. (Docket No. 96, Specter Dep. at 6-7.)

Dr. Specter testified that Susie had none of the findings, such as decreased bone density, decreased thickness of the bony cortex or presence of multiple Wormian bones, that are typically found in patients with a diagnosis of OI. (Docket No. 90, State's Dep. Exs., Ex.

-24-

4A, Specter Aff. at 4.) It was Dr. Specter's opinion, based on her review of the x-rays and CT scans, that Susie was "a victim of non-accidental trauma on repeated occasions." (*Id.* at 8.)

The Court observes that there was clearly a dispute among the State's witnesses as to the presence and relevance of a depressed skull fracture. Drs. Azizkhan, Merten, Specter, and Tennison testified that the CT scan shows a depressed skull fracture. (Azizkhan Dep. at 32; Merten Dep. at 21-22; Specter Dep. at 44-45; Tennison Dep. at 23-24.) Dr. Specter, however, did not notice a depressed skull fracture on the x-ray in 1991 (Specter Dep. at 44-45) and Dr. Chancellor did not find one during the autopsy. (Chancellor Dep. at 65-66.) Dr. Chancellor explained this discrepancy by noting the possibility that Susie had a "ping-pong fracture." (*Id.* at 65.) A ping-pong fracture is "an indentation of the skull . . . where there is no actual breakage of bone, but there is a bending of it." (*Id.*). Such a fracture can go away, though "[i]f there is a breakage of bone, that doesn't go away." (*Id.* at 66.) This description is in accord with a statement made by Dr. Merten in which he stated that the depressed skull fracture was described by Dr. Whaley as a "bending of the low middle cranial fossa." (Merten Dep. at 22.) Dr. Azizkhan stated that the depressed skull fracture actually is "irrelevant" because the issue was the degree of the intracranial injury, . . . not the degree of the skull fracture." (Azizkhan Dep. at 45.)

Prior to her death, Susie had other health issues, as documented in medical records and described by various medical professionals. Susie's mother, Lisa O'Daniel, had taken

-25-

Susie to the hospital in July because she was crying and unable to eat. At four months old, Susie's weight was only 10.5 pounds and she was 22.75 inches long, placing her in the bottom fifth percentile for weight and height. (Runyan Dep. at 87.) In an interview with prosecutors in February 1993, Ms. O'Daniel stated that she had been unable to feed Susie for three weeks prior to her death. Clearly, then, Susie was a baby who was not thriving. (Tennison Dep. at 55-58.) Significantly, while she was in the ICU, the doctors determined that Susie suffered from coagulopathy, a condition that compromises the ability of blood to clot, *and which can cause easy bruising of the skin*.[6] (Azizkhan Dep. at 16, 25.)

Had defense counsel for Petitioner Burr adequately prepared for trial and obtained the testimony of expert witnesses, they could have contested critical conclusions of the State's experts and offered to the jury a plausible accidental cause for Susie's fatal injury. The head injury was the fatal injury, and counsel could have argued to the jury at the close of evidence

---

[6] The issue of the bruises found on Susie on August 25, 1991, is complicated. A medical record from the North Carolina Memorial Hospital notes "multiple old and new bruises covering [] body." (Consultation Visit Record.) The Report of Investigation by Medical Examiner in those same medical records includes body diagrams that show bruises all over Susie's body. By the time of these diagrams, some bruises may have been caused by medical intervention. The bruises appear to include an "injury" bruise at the center of the back of Susie's head. And there are "injury" bruises on Susie's neck and chin. The interpretation of the bruising would be a matter for argument to the jury. Competent defense counsel would highlight the fact of Susie's coagulopathy (easy bruising), the evidence of bruising of the neck several weeks earlier when Susie visited her natural father (Record Sheet, N.C. Mem. Hosp. "Social Work" entry of Aug. 25, 1991), and the evidence that Susie suffered a serious fall, with her brother falling on top of her, to rebut an argument that Petitioner must have caused the bruising by grabbing and hitting Susie when he was alone with her.

-26-

that competent medical and scientific evidence showed that the head injury was caused by an accidental fall suffered by the child that was well-documented in contemporaneous medical and other records. Lisa O'Daniel and Scott Ingle initially described the fall as being quite serious. According to the original statements of these witnesses, Scott tripped over a cord while carrying Susie. The witnesses originally recounted that Susie fell all the way to the ground, out of Scott's arms, and then Scott fell on top of her. Counsel could have pointed out to the jury that the actual testimony of these witnesses on the stand – to the effect that Scott only fell to his knees and "cradled" the baby – was strongly contradicted by their original statements. Defense counsel could have also directed the jury's attention to the suggestive question put by a law enforcement officer to Ms. O'Daniel during a pretrial interview wherein the officer injected the terminology that perhaps eight-year-old Scott was in fact "cradling" the baby in his arms during the fall and "protecting" her. Counsel could have argued that the baby obviously would not have turned "real red," shaken, jerked a whole lot, cried for an hour and a half, and appeared less than normally responsive, as witnesses first reported, unless there was in fact a serious fall and apparent neurological impact upon the child. In closing argument with regard to the fall, defense counsel could have asked the jury to find that, just hours before her death from a head injury, Susie suffered a damaging fall wherein she was dropped to a gravel road from a height of three feet or so and then her brother landed on top of her, causing trauma to her head.

-27-

Further, defense counsel could have argued to the jury that other injuries suffered by Susie, such as broken bones that were already partially healed by the day of her death, clearly influenced the State's experts to find that *all* of Susie's injuries, including her head injury, were part of an extended pattern of intentional abuse suffered by the baby. The prosecutor attributed this pattern of abuse to the hand of Petitioner Burr. Competent defense counsel would have conceded, of course, that Susie *was* a victim of serious abuse over an extended period of time. But very little evidence presented at trial tied Petitioner to any abuse of Susie before the date of her accidental fall and head injury. And the evidence that was introduced on this point was subject to effective impeachment by competent defense counsel. *See* discussion below.

In order to assess the strength of the State's evidence that Petitioner Burr had abused Susie before August 24, 1991, the date of the fall, the Court must consider the wider context of the investigation into the death Susie of O'Daniel. Susie died as a result of a discrete head injury, but she had already been a victim of severe abuse for some time before she suffered that injury. Susie had comminuted fractures of her legs and at least one arm for a week or more before her head injury. *Yet no report to authorities or physicians was made by Lisa O'Daniel or any other family member about Susie's battered and painful condition.* As was ominously reported after the fact by Dr. Runyan, a treating physician for Susie, "[Susie's] family's account of her behavior does not fit [her actual history of injuries]." (*See* Recommendation of Dec. 14, 2004, at 40.)

-28-

Further, it is absolutely clear that Lisa O'Daniel understood even before a police investigation began that she, as primary caregiver for Susie, would be the target of suspicion regarding the child's injuries. Indeed, she testified at trial that as she left her trailer to take Susie to the hospital on the night of August 24-25, she told her sons that "as bad as their sister looked that if anybody came by and asked them did I abuse them or beat on them, you tell them that I whip you in the right way." (Trial Tr. Vol. 17, at 163.) Competent defense counsel would have looked for indications that Ms. O'Daniel's interest in protecting herself and her family may have influenced the development of damaging testimony against Petitioner Burr. Of course, the radically sanitized descriptions of the accidental fall suffered by Susie given by Ms. O'Daniel and Scott at trial would have been one major indication of testimony influenced by self-interest, but there were other indications, as well. Defense counsel would have found substantial alterations, all to the detriment of Petitioner, in the statements of Ms. O'Daniel and Scott regarding alleged incidents of abuse of the baby by Petitioner in the weeks before Susie's head injury.

As evidence of Petitioner's prior use of violence, the State relied on the testimony of ten-year-old Scott Ingle.[7] A close examination of Scott's testimony, however, reveals glaring internal inconsistencies, several of which competent trial counsel could have used to impeach Scott.

---

[7] As pointed out by Petitioner, Scott was a much more sympathetic witness than Lisa O'Daniel, Susie's mother.

-29-

Significantly, Scott denied any form of abuse of Susie by Petitioner Burr when Detective Allen and Captain Qualls interviewed Scott on September 6, 1991, just two weeks after Susie's death. Detective Allen specifically asked Scott whether he had ever seen Petitioner harm Susie:

> DET. ALLEN:    Q: Alright, have you ever seen Johnny do anything to your little sister Susie? Whip her or do anything to her?
>
> SCOTT INGLE:    A: Nope

(Second Amend. to MAR, Ex. 4, Interview with Scott Ingle at 4.)

The evidentiary record now before this Court shows that, over a year later, two of the state's prosecutors met with Scott shortly before Petitioner's trial. At that meeting, Scott said for the first time that he had seen Petitioner shake Susie on two or three other occasions. The questions and answers for this session are somewhat disjointed, and it is difficult to determine exactly which incidents Scott is describing at which time. In the interview, Scott's answers appear typical of a young child; he often does not answer the question asked and jumps from one topic or description to another. From what may be gleaned from the interview, however, Scott describes at least two incidents where he observed Petitioner shake Susie. The first incident occurred on a day when he and his mother, Lisa O'Daniel, were playing football outside the trailer and Petitioner and Susie were inside the trailer:

> Q:    So, your mama and Tony and you were outside playing football?
>
> A:    Yea, and I went in.
>
> Q:    And you went in. Alright, where was Susie?

A:   In the house.

Q:   Where at

A:   He was suppose[d] to be watching her.

Q:   Where

A:   Cause my mama didn't get to play with us much, so we wanted [her] to play with us that day.

Q:   Okay, why did you go inside?

A:   To get some drink.

Q:   To get something to drink.

A:   And I didn't get nothing because he was doing that [unintelligible] and I hide [unintelligible] in case something would happen.

Q:   He had what?

A:   [unintelligible] I thought something might would have happened.

Q:   And where was Susie at when you went inside?

A:   She was in the living room in - you know that swing thing.

Q:   So she was in the living room in her swing and what was she doing? Was she happy or was she asleep or was she crying or was she not doing anything at all?

A:   I went in there and she was laying down and he just - she crying cause she was hungry and he just jerked her up by her arm - and he shook and jerked her up by her arm.

Q:   Okay, show me, now you say she was in a swing.

A:   Yeah

-31-

Q:     Was she sitting up

A:     When he jerked her up he took her in there and started feeding her.

            . . . .

Q:     When he shook her what did Susie do?

A:     She started crying and he tried to make her stop crying.

Q:     How did he try to make her stop crying?

A:     Like my mama would - he would do her like that - but she was spoiled
       by my mama - so she would cry a lot when she wasn't around . . .

Q:     Let me ask you something Scott?  Was Susie crying before or after
       Johnny picked her up out of the swing?  And you say he grabbed her
       and shook her.

A:     She was happy - but she started crying because she got hungry and she
       had to use the bathroom.  But he thought she was hungry I reckon
       because he started feeding her.

Q:     Okay - so she started crying and then that's when he went over and
       started shaking her - is that what you are telling me?  Or did she start
       crying after?

A:     She started crying because she used the bathroom [unintelligible] or
       was hungry and I said that he probably thought she was hungry because
       he started feeding her.

Q:     Okay - that's what I'm wanting to ask you.  Okay - when she started
       crying and that when he went over and grabbed her - did he say
       anything to her when he grabbed her?

A:     He said Shhhhhhhhhhhhh.

Q:     Okay -

A:     He didn't know I was in there because I hid.

                                -32-

Q:     Where were you hiding at?

A:     I was - it was like - I was hiding in my bedroom and I was kinda peeking out to look.

Q:     So you had kinda

A:     And when he took her in there - I ran - I crawled behind the couch or the chair I don't remember - it was something like a stereo I was behind or beside the stereo and between the tv - you know - we used to have a little crack and I crawled - I crawled behind that [and] looked - and then when he took her in the kitchen

Q:     So you were hiding - peeking out - he didn't know you were there.

A:     See, I am sneaky and real quiet.

       . . . .

Q:     . . . So he kind of did like this shhhhhhh and then grabbed her by the arm and pulled her out. But when he did that did she stop crying and did she start crying harder?

A:     She started crying harder and he gave her some milk and started doing like mama and then she stopped crying and that's right when mama came in and I went out . . . .

(Second Amend. to MAR, Ex. 3, Interview at 13-15.)

Scott also told the prosecutors about another time he saw Petitioner shake Susie. He said that he was inside "peeking" through the bedroom door:

A:     I came in cause I heard her crying and then I peeked.

Q:     What do you mean - were you outside and heard her crying or were you [inside].

A:     Yeah - see we had a big yard and they were out in the woods in a - it was a big homemade planet clubhouse

-33-

Q:   Kind of behind your house

A:   It was way on out that way cause we had a great big yard and I was close to the house and then I

Q:   What did you hear?  You say

A:   I heard her crying and I then I ran in and I figured he'd probably be done shaking her again and he was shaking her again.

Q:   Where was she at?  How loud was she crying?

A:   Not loud enough

Q:   Not loud enough to hear her up at Rita's

A:   No

Q:   But loud enough for you to hear outside the trailer

A:   Yeah - I was nearest - I was in the backyard cause - cause you see I was - in my mama

Q:   Okay - so were in the back near the backdoor

A:   And the backdoor is near my mama's room

Q:   Right near your room too isn't it?

A:   Yeah

Q:   Okay

Q:   So you were both - when you - You say you [snuck] in did you kind of creep in so he couldn't hear the door open or what did you do?

A:   There's a crack about that big and I just peeked.  Peeked into the bedroom.

Q:   Peeked into the bedroom?  Where was Susie at when you looked in?

-34-

A:  He was shaking her in her bed.

Q:  Who was?

A:  [Petitioner]

Q:  How was he shaking her - you mean she was laying in her bed?

A:  Yes - he was the onliest one that shake her - my mama never did shake her - she'd just pick her up and do her like that - but that ain't shaking her -

Q:  Kind of rock her

A:  No, she did rock her.

        . . . .

A:  I don't know why he picked her up - he just started - picked her up for no reason - she wasn't even crying.

Q:  I thought you said she was crying.

A:  Not that - oh yeah, oh yeah, I was thinking of another time.  That was the day after that day.

Q:  The day after you were playing football

A:  Yeah - it was real - no - it was about - you could say three days it was close to when she died.

Q:  Okay, so about three days after you played football is when you - when you heard her crying and you were outside the trailer.

A:  Yeah and about two - about two or three more days - maybe four he was is when I heard her not crying I just walked in and he just started shaking her.

(*Id.* at 17 -19.)

-35-

Scott described a third incident which occurred the day before Susie was taken to the hospital. Scott told the prosecutors that on this day, he saw Petitioner shake Susie and that Petitioner saw Scott watching him. Scott said that he was playing outside with his two brothers (Tony and JJ) and that he walked inside:

A:     I walked - when I walked in I - he - he - that's when he just went over there and you know and he - she didn't do nothing that day neither - she was just sitting there and he did that two times.

Q:     He did what two times?

A:     He shook her two times - remember that time I told you he shook her one time and she wasn't crying - I mean - or anything - just laying in the bed - she was - the day before she died - she - he did that to[o] and she wasn't crying or anything.

Q:     Okay - that's what I

A:     And I walked in and I saw him walk to the bed and he just.

Q:     Was she laying in the bed? Was Susie in the bed when Johnny walked in?

A:     Oh, yeah, she was in her bed.

Q:     Okay - that's what we want to know - where Susie was [when] you saw Petitioner do that to her.

Q:     Show me how he . . . shook her that day.

A:     He got her like right here - and he got her right there and she was hitting - her head was kinda let against the pillow but it couldn't - but her head couldn't hurt but I know her - he - her waist was probably hurting because she did cry and she probably was in shock a lot too.

Q:     So her head was bouncing on the pillow.

-36-

A:    Yeah.

(*Id.* at 21-22.)

Later, Scott said that Petitioner was playing with Susie and tickling her belly. He also appeared confused about which incident he was talking about to the prosecutors, but eventually, after much questioning, he agreed that there were three separate incidents. (*Id.* at 26.) In at least one of the incidents, Scott told the prosecutors that he heard Petitioner cursing and yelling at Susie to "shut up." (*Id.* at 22, 28.) It is unclear how long this interview lasted, but it is almost painful to read the transcript. Scott often appears confused and overly willing to please. He appears protective of his mother during the interview, speaking of how Lisa "spoiled" Susie and how she never shook Susie.

At trial, Scott testified about two incidents in which he observed Petitioner shake Susie. These two incidents were uncorroborated by any other witnesses. Like Scott's recounting of his fall with Susie on August 24, Scott's stories of these two prior incidents also changed over time. Scott told the prosecutors that on the day he was playing football ("the football incident"), he went inside to get a drink; at trial he testified that he went inside "cause [he] heard [Susie] crying." In another example of the inconsistency of Scott's statements, he testified at trial that Susie was not crying before Petitioner shook her. As noted above, however, in the pre-trial meeting with prosecutors, Scott had said that "Susie was happy - - but she started crying because she got hungry and she had to use the bathroom." In his testimony about the second incident, Scott testified that he was outside

-37-

playing with Tony and JJ, and that he heard Susie crying, so he went in and peeked through the door. Scott testified that Susie was in the living room, and that Petitioner took her into the kitchen, where he shook her. In the interview, however, Scott had said that Susie was in her swing and Petitioner grabbed her by the arm and started to feed her. Scott testified that he was scared of Petitioner and that he did not tell anyone of this incident because he was scared that Petitioner would kill his mother.[8] In fact, Scott did not tell police officers about this incident and did not report it to anyone until he told the prosecutors when they were preparing him for trial.

A reasonably competent attorney, recognizing the significance of Scott's testimony and the need for the State to explain the older bruises on Susie's body, could have impeached Scott's trial testimony which was diametrically different from what he told the police in the days after Susie's death. Scott testified that he was scared of Petitioner, and that is why he did not tell the police officers about the prior shaking incidents. However, at the time of his interview with the officers, Petitioner was already in jail.

Moreover, it is clear from Scott's trial testimony, that he blamed himself for Susie's injury, or, at the very least, worried that his fall with his sister caused her injuries. Competent counsel would have pointed out the illogic of this worry, even for a young child, based on the trial testimony he actually gave. Counsel could have argued that it did not make

---

[8] Scott's testimony of these threats by Petitioner is also internally inconsistent. It is unclear from his testimony and statements exactly when his mother told him that Petitioner had threatened to kill her.

sense for Scott to blame himself, if, as he testified at trial, he succeeded in cradling Susie in his arms during his fall and she suffered no impact in the fall, and he had seen Petitioner shake or hit Susie on more than one occasion.

Scott was a very young child at the time of Susie's death and was still only ten years old when he testified at Petitioner's trial. It is clear from the transcript of his meeting with the prosecutors (and even his trial testimony) that he was confused, scared and easily susceptible to suggestion. These feelings were understandable under the circumstances, and Scott was undoubtedly a sympathetic witness. There is, of course, an inherent risk in a strong cross-examination of a young child. However, at some point, the inconsistencies in Scott's story reach a magnitude that goes to the reliability of the witness, and it was incumbent upon trial counsel to show the weakness of Scott's testimony in order to limit its effect. No other witness testified concerning any violence against Susie by Petitioner.[9] The use of a ten-year-old child to do so left that child open to cross-examination. The fact that Scott changed his

_____

[9] Lisa O'Daniel testified at trial that "about two weeks before Susie's death," she [Lisa] heard Susie scream at 4:00 a.m. and found Petitioner "holding Susie up in the air." (Trial Tr. Vol. 17, at 195, 198-200.) According to Lisa, "[Susie] was red . . . [i[n the same place he had his hands." (*Id.* at 199.) Notably, and unknown to defense counsel at the time of trial, Lisa had previously placed this incident in time about two days before Susie's death. (Second Amend. to MAR, Ex. 1, Interview with Lisa O'Daniel at 3.) By the time of trial, however, Lisa moved the incident back in time, arguably to account for the week-old fractures that Susie suffered. Lisa's trial testimony about "prior abuse" by Petitioner does not appear strong, since she did not say she saw Petitioner hit or shake Susie. Nonetheless, competent counsel could have impeached even her weak testimony by pointing out that Lisa had previously made an inconsistent statement to the effect that Petitioner had never abused Susie and Lisa did not know who was responsible for harming her daughter. (Record Sheet, N.C. Mem. Hosp. "Social Work" entry of Aug. 25, 1991, "Interview with Mrs. O'Daniel.")

-39-

testimony on two key factors of the case, i.e., (a) whether he had ever seen Petitioner abuse Susie, and (b) the severity of his fall with his baby sister, greatly undermined his overall reliability and should have been a focus of counsels' trial strategy.

Consistent with evidence presented at trial, defense counsel could have maintained during closing argument, in complete agreement with the State's experts, that Susie was abused and neglected in the last weeks of her life before the date of her head injury. Harkening back to a report to the Department of Social Services made by Dr. Runyan, counsel could have reminded the jury that "[Susie's] family's account of her behavior does not fit [her actual history of injuries]." Susie's mother and family members must have seen signs of the pattern of abuse, including even multiple, painful bone fractures suffered by the baby, long before the date of her death, but they made no report of abuse. As the physician wrote, the "family's account" did not fit the facts. Counsel could have asked the jury to find that no reliable showed that Petitioner had anything to do with the abuse of Susie, certainly not that which included broken bones, before her death. They could have argued that the negative portrayal of Petitioner as a repeated and continuous abuser, so critical to the prosecutor's case in seeking Petitioner's conviction and death sentence, was without significant or credible foundation in the evidence.

Defense counsel could have argued that the circumstantial evidence that Petitioner was the last person in the child's presence before Petitioner and others began to notice symptoms of a head trauma was not strong evidence against him in view of the real facts

-40-

concerning the seriousness of Susie's accidental fall hours earlier. Even State experts recognized that a fall from a height of three feet or so could have caused the head trauma that led to Susie's death. Moreover, there was competent evidence by defense experts that Susie could have appeared normal and lucid for the period of time after her injury from the fall and before the beginning of her symptoms since the onset of brain swelling can be variable.

In a summation, defense counsel could have emphasized to the jury the strong evidence of longstanding child abuse directed toward Susie before the day of her head injury, none of which was shown by credible evidence to involve Petitioner. Counsel could have pointed out that the family's behavior in the last weeks of Susie's life simply "did not fit" the actual history of the baby's injuries according to the treating physician. And counsel could have strongly advocated the agreement of State and defense experts that Susie's head injury could have been caused by an accidental fall of the severity described in the original statements of Lisa O'Daniel and Scott Ingle. On the basis of these lines of argument, defense counsel could have asked the jury to find Petitioner "not guilty" of the murder charge against him.

Instead, lacking a defense bolstered by the testimony of medical experts, counsel was left with no choice but to concede, at the close of the guilt phase of the trial, that Susie's fall with Scott could not have caused her fatal injuries. Almost in passing, counsel offered an alternative "defense," one that was patently unbelievable:

-41-

I submit to you that in order to create a reasonable doubt in your mind, you need to make some effort at least to show you that there is an alternative theory as to how this occurred.

Because of the fact that we can't prove – we can't prove Johnny innocent, but we need, I think, to show you and I think the evidence does show you the reasons why you ought to have a reasonable doubt.

And if you'll bear with me a minute, I want to start a little bit at this other end.

Mr. Burr testified that he took Tarissa, Susie, and put her in the baby swing, and went back in the other room, all way back at the end of the trailer, front door is open, the back door is open. Susie is near the front door. Johnny is back in the back room working at the back door.

Some stranger, some deranged stranger might wander by and see the child in the trailer, go on in and hurt her.

Now, ladies and gentlemen, that's possible, but it should raise a reasonable doubt in your mind as to whether or not that's the way this incident occurred.

I suggest to you it probably was not - - it is certainly a possible explanation, but that's probably is falls within what the District Attorney's office would call the ingenuity of counsel, a fanciful doubt, not a reasonable doubt.

(Trial Tr. Vol. 27, at 2172-73.)

In contrast to defense counsel's inept "deranged stranger" explanation for Susie's death, one of the State's attorneys, in the final argument to the jury, stated:

Mr. Burr, for whatever reason, whatever callousness or maliciousness, depravity, took that child and hit her against her babybed or the wall and hit her (hits against the table), banged her, pulled her arms back, grabbed the poor child under the neck, the handspring, grabbed her under there and with her – wherever he had her with a closed fist, hit her.

-42-

And that's how her head got pushed in, without the skin being broken, because if he hit her like that, you'd probably have broken skin.

But there was none, and I submit to you it was done with a fist and that's my theory.

The same man who bends arms, and wrists and fingers, and pushes people, and even though they want to say it's a game, what a game.

(*Id*. at 2251-52). Clearly, had defense counsel performed a meaningful investigation and presented evidence that called into question the State's medical evidence and presented an alternate explanation for Susie's death - one that wholly exculpated Petitioner - the case could have sounded vastly different to the jury.

The cause of Susie's death was an essential element of the State's case, established primarily through expert medical witnesses. In cases where a defendant is indigent, courts often approve the allocation of funds so the defendant can secure the assistance of independent experts. In fact, as the Fourth Circuit has stated, "[there can be no doubt that an effective defense sometimes requires the assistance of an expert witness." *Williams*, 618 F.2d at 1026. The ABA Guidelines clearly acknowledge this fact. In this case, of course, there was no request made by the defendant for funds to consult with an expert.[10] Had an expert been

---

[10] In an affidavit submitted in the MAR proceeding, attorney Thomas F. Loflin, III, a criminal defense attorney, opined that the "failure of Mr. Burr's trial counsel . . . to apply to the trial court for funds to employ the assistance of a medical expert . . . amounts to startlingly ineffective assistance of counsel and falls far below the standard required of lawyers practicing criminal law in the courts of the State of North Carolina." (MAR, App. H, Loflin Aff.) The MAR court gave little or no weight to Mr. Loflin's conclusions. (MAR Order I, Oct. 3, 1997 at 69-73.)

consulted, counsel could have, at the least, challenged the notion that Susie had a depressed left temporal skull fracture and that it was caused by the Petitioner hitting Susie with a closed fist. Counsel also would have been able to discredit the medical experts who testified about the presence of the skull fracture, thus potentially preventing the State from arguing that the jury could infer malice, premeditation, and deliberation from the alleged blow to Susie's head. Of course, absent malice, premeditation, and deliberation, the case could have been one of second-degree murder rather than first-degree murder. "Evidence that creates a 'battle of the experts' is precisely the type of evidence that gives rise to reasonable doubt, and thus will typically support a finding of prejudice." *Pinholster v. Ayers*, 525 F.3d 742, 777 (9th Cir. 2008) (Fisher, J., dissenting), *reh'g granted en banc*, 560 F.3d 964 (2009). There is, of course, no evidence that defense counsel, after undertaking a thorough investigation and consulting with experts, concluded that a battle of experts on the medical evidence was not in Petitioner's best interests. Indeed, such a conclusion was impossible in this case precisely because counsel did not consult with experts or even completely review Susie's medical records. Trial counsels' failure to review the medical evidence and consult with medical experts, when viewed in light of the medical testimony developed in this habeas proceeding that would have been exceedingly helpful to Petitioner's defense, creates a reasonable probability that the outcome of his trial and sentencing proceeding would have been different had trial counsel represented Petitioner competently.

-44-

This Court concludes that there is a reasonable probability that the jury, or at least one juror, in Petitioner's case would have formed a reasonable doubt as to his guilt on the charge of first-degree murder had they heard the expert medical testimony that should have, and could have, been presented on Petitioner's behalf. The State tried Petitioner for his life. Petitioner was constitutionally entitled to effective assistance of counsel, but counsel failed to investigate the most critical issue in the case, the cause of Susie's death. Counsel incompetently and without a reasonable basis conceded that the baby's accidental fall earlier in the day could not have resulted in her death. Due to defense counsels' deficient performance, Petitioner was deprived of a level playing field with the State, and was convicted in a trial where his only plausible defense, an absolute defense that could have been supported by competent expert testimony, was never even investigated. The expert medical testimony now proffered by Petitioner concerning the immediate cause of Susie's death is sufficient to undermine the Court's confidence in the outcome of Petitioner's trial. As succinctly stated by the Sixth Circuit Court of Appeals, and equally applicable here, "[t]he difference between the case that was and the case that should have been is undeniable." *Stewart*, 468 F.3d at 361.

### The Unreasonableness of the Decision of the State MAR Court

Under 28 U.S.C. § 2254(d)(1), a federal district court may not grant habeas relief unless the state court's adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2); *see also Williams v. Taylor*, 529 U.S. 362 (2000).

With regard to the ineffective assistance of counsel issue, the state MAR court found:

> Defendant's current counsel have found experts who take issue with the State's witnesses at trial. The mere fact that they have found such experts does not demonstrate ineffectiveness of counsel. First, matters of record demonstrate that trial counsel spent a reasonable amount of time investigating circumstances relating to the case. Second, court decisions concerning *Strickland* demonstrate that the first prong of *Strickland* requires the court to evaluate trial counsel's actions in light of the circumstances facing trial counsel at and before trial... Third, in the Court's opinion, defendant proffers nothing demonstrating that his trial was fundamentally unfair or that the results are unreliable as a result of trial counsel's performance.

(MAR Order I at 76.) The MAR court similarly rejected Petitioner's claim that trial counsel were ineffective for failing to move the court for funds to obtain the assistance of an independent expert to conduct an investigation and assist counsel with the medical evidence:

> The Court holds that this claim is without merit for several reasons. First, for reasons discussed above . . . (e.g., trial counsel conducted a diligent investigation, had considerable experience in defending against serious charges, had considerable experience in matters relating to child abuse, and had access to considerable medical evidence prior to trial) the Court concludes that matters of record demonstrate that counsel's decision to not submit a request for expert assistance was not action below the standard established by the first prong of *Strickland*. Second, the Court knows from its own experience that an experienced trial attorney does not always need a physician by his or her side to understand medical evidence relating to child abuse. Stated otherwise, the failure to request expert assistance in such a case does

-46-

not, in the Court's opinion, demonstrate that trial counsel fell below the standard of reasonable competent counsel. . . . Third, for reasons previously stated (e.g., the third reason stated above . . . - - no demonstration of unfair trial or unreliable results), the Court concludes that defendant has not demonstrated that the claimed error caused prejudice, the second prong of *Strickland*.

(MAR Order I at 78.)

This Court, in its initial Recommendation, examined in detail the unreasonableness of the state MAR court's determination that trial counsel did not perform incompetently. Nothing in the expanded record or supplemental briefing changes the Court's conclusion. As noted in the Recommendation, the MAR court reached a result that was significantly at odds with the evidence of record. It is unnecessary to revisit the specific instances of unreasonableness; the Court has re-entered and incorporated the prior Recommendation by reference, *supra*, at 2. Additionally, the Court notes that the MAR court failed to consider relevant ABA Guidelines when evaluating the performance of counsel. The United States Supreme Court has repeatedly held that the ABA guidelines should be considered when assessing whether counsel's performance was deficient. *Strickland*; *Wiggins*; *Rompilla*. Counsel in this case clearly failed to meet the standards of the Guidelines concerning investigation, preparation, and use of expert witnesses. As such, the failure of the MAR court to find deficient performance, and resulting prejudice, was unreasonable and relief should be granted.

This Court's scope of review on habeas corpus is highly constrained and deferential of the state court decision. *Williams*, 529 U.S. at 389-90. The MAR court's disposition of

Petitioner's ineffective assistance of counsel claim, however, cannot withstand scrutiny, even under the deferential review prescribed by AEDPA. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."). Where, as here, deprivation of a habeas petitioner's Sixth Amendment right to competent assistance of trial counsel is clearly shown, and the prejudice to Petitioner from being deprived of a potentially viable absolute defense in a capital case is adequately demonstrated, this Court should grant the writ of habeas corpus.

### **Additional Matters**

There are several other matters pending by motion of the parties:

1.      The State moved to expand the record to include the affidavit of Dr. Jerry Bernstein (Docket No. 67). This motion is granted.

2.      Petitioner moved to expand the record to include reports from Drs. Plunkett, West, and Thibault (Docket No. 86). This motion is granted.

3.      The State moved to expand the record to include affidavits of Margaret Costner, Vera Porter, and James Lynch and the report of Dr. James C. Hyland (Docket No. 89). This motion is granted.

4.      The State moved to expand the record to include written transcripts of depositions of nine experts; Dr. Runyan's statement dated November 28, 2006; the State's

-48-

Case 1:01-cv-00393-WO-JEP   Document 123   Filed 05/06/09   Page 48 of 52

Petitioner's ineffective assistance of counsel claim, however, cannot withstand scrutiny, even under the deferential review prescribed by AEDPA. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."). Where, as here, deprivation of a habeas petitioner's Sixth Amendment right to competent assistance of trial counsel is clearly shown, and the prejudice to Petitioner from being deprived of a potentially viable absolute defense in a capital case is adequately demonstrated, this Court should grant the writ of habeas corpus.

### **Additional Matters**

There are several other matters pending by motion of the parties:

1.      The State moved to expand the record to include the affidavit of Dr. Jerry Bernstein (Docket No. 67). This motion is granted.

2.      Petitioner moved to expand the record to include reports from Drs. Plunkett, West, and Thibault (Docket No. 86). This motion is granted.

3.      The State moved to expand the record to include affidavits of Margaret Costner, Vera Porter, and James Lynch and the report of Dr. James C. Hyland (Docket No. 89). This motion is granted.

4.      The State moved to expand the record to include written transcripts of depositions of nine experts; Dr. Runyan's statement dated November 28, 2006; the State's

deposition exhibits; certain State trial exhibits; and certain designated DVD's and videotapes (Docket No. 91). This motion is granted.

5.     The State moved to expand the record to include the affidavit of District Attorney Robert F. Johnson with attached exhibits (Docket No. 112). In conjunction with this motion, the State filed a 24-page "Post-Discovery Supplemental Brief" (Docket No. 113). Petitioner moved to strike the State's Post-Discovery Supplemental Brief, Supporting Affidavit and Other Materials (Docket No. 118). For reasons discussed below, the Court will grant the State's motion and deny Petitioner's motion.

In his post-discovery supplemental brief, Petitioner did not discuss a *Brady*[11] claim. His brief solely dealt with the ineffective assistance of counsel claim, the medical evidence and post-trial discovery (Docket No. 87). Accordingly, the State did not discuss any *Brady* issue in its brief (Docket No. 88). In his reply brief, Petitioner included a separate argument asserting a *Brady*/prosecutorial misconduct claim with regard to certain evidence Petitioner claims was wrongfully withheld from him (Docket No. 109). The State then filed a supplemental brief addressing Petitioner's *Brady* claim (Docket No. 113), together with a motion to expand the record and an affidavit from District Attorney Robert F. Johnson, with attachments (Docket No. 112). Petitioner filed a motion to strike this supplemental brief, affidavit and attachments (Docket No. 118).

---

[11] *Brady v. Maryland*, 373 U.S. 87 (1963).

While the Local Rules of this court do not specifically allow surreply briefs, they also do not specifically prohibit such briefs. *See* Local Rule 7.3(h). Generally, courts have permitted surreply briefs when a party seeks to respond to new material that an opposing party has raised for the first time in its reply brief. *See, e.g., Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001) ("The standard for granting a leave to file a surreply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply."); *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672 (M.D.N.C. 2003) (allowing surreply brief); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003) ("Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."). Technically speaking, Petitioner first raised a *Brady* claim in the state post-conviction proceedings and again in his petition for a writ of habeas corpus, filed in this court in 2001. The State responded to the claim in its initial response. However, the emphasis in the proceedings subsequent to this Court's initial Recommendation has clearly been on the medical evidence and Petitioner's claim that he received ineffective assistance of counsel. It is somewhat disingenuous of Petitioner to insert a *Brady* argument into his final brief filed in 2007 and then argue that the State should not be afforded an opportunity to respond. As such, given the lengthy and complicated procedural history of this case, and because the State's supplemental brief responds directly and briefly to the material presented in Petitioner's reply brief to the State's post-conviction brief, the Court will grant the State's

motion to expand the record, and accept the surreply brief and attachments as filed.

Petitioner's motion to strike the supplemental brief, accordingly, will be denied.[12]

## Conclusion

For reasons set forth above and in the incorporated Recommendation of December 14, 2004, **IT IS RECOMMENDED** that a writ of habeas corpus be issued and the Petitioner's conviction and death sentence for first-degree murder be vacated without prejudice to the State's right to retry Petitioner within a reasonable period of time.

---

[12] Because the Court has found that Petitioner received ineffective assistance of counsel and is recommending that his petition for a writ of habeas corpus be granted, it is unnecessary to reach the *Brady* issue. However, the Court does note that Petitioner has not made a substantial showing of prosecutorial misconduct. As discussed in this supplemental recommendation and the initial recommendation, the failures in this case were with defense counsel, not the district attorney. The district attorney's office maintained an "open-file" policy and, with regard to medical files, x-rays, test results, etc., that were not physically in the possession of the prosecuting attorney's office, defense counsel were informed of the location of these files. The affidavit of District Attorney Johnson details, at length, the compliance of his office with discovery obligations. (Docket No. 112, Motion to Expand Record, Ex. 1.) The fact that some of the material was never examined by defense counsel was, again, a result of the ineffective assistance of counsel, not any prosecutorial misconduct. Petitioner has simply not made an adequate showing under *Brady* and its progeny that the State suppressed any evidence in this case. *See also Banks v. Dretke*, 540 U.S. 668 (2004) (discussing the components of a *Brady* claim). The only evidence that, arguably, was not turned over or disclosed was a videotape of Susie, recorded four to seven weeks before her death which, at some point, was turned over to the State by Susie's aunt and uncle, Donald and Rita Wade. Both of these individuals testified at trial, and there was no mention in their testimony of the videotape. The videotape was not introduced at trial. District Attorney Johnson states in his affidavit that there is no record of when his office received the videotape, but Petitioner's first post-conviction counsel, J. Kirk Osborn, was specifically made aware of its existence in a document dated November 25, 1998, in response to Petitioner's post-conviction discovery motion. In the event Petitioner is retried in this case, of course, his counsel would have all of the evidence that his first trial counsel either overlooked or neglected to obtain.

-51-

Further, **IT IS ORDERED** that the Motion to Supplement Motion to Expand the Record (Docket No. 67) and the Motion to Supplement to Expand the Record (Docket No. 86) be **GRANTED**. **IT IS FURTHER ORDERED** that Respondent's Motions to Expand the Record (Docket No. 89, 91) be **GRANTED.** Finally, **IT IS ORDERED** that Respondent's Motion to Expand the Record (Docket No. 112) be **GRANTED** and that Petitioner's Motion to Strike Respondent's Post-Conviction Supplemental Brief, Supporting Affidavit and Other Materials (Docket No. 118) be **DENIED**.

_____
P. Trevor Sharp, U.S. Magistrate Judge

May 5, 2009