IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHN EDWARD BURR,                )
                                 )
                Petitioner,      )
                                 )
        v.                       )        1:01CV393
                                 )
DENISE JACKSON,[1]               )
Warden, Central Prison           )
Raleigh, North Carolina,         )
                                 )
                Respondent.      )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Petitioner John Edward Burr, a prisoner of the State of
North Carolina, filed a petition for a writ of habeas corpus
pursuant to 28 U.S.C § 2254, (Doc. 2), on April 12, 2001, which
this court granted, (Docs. 139, 140), on May 30, 2012. The
United States Court of Appeals for the Fourth Circuit reversed
the judgment, (Doc. 149), on March 11, 2013, and remanded
Petitioner's case to this court for further proceedings. After
additional briefing and argument, the court finds that
Petitioner is not entitled to relief and therefore denies the
Petition.

---

[1] Denise Jackson succeeded Mr. Carlton Joyner as Warden at
Central Prison. The case caption is hereby amended to accurately
reflect Ms. Jackson as the Respondent.

## I.  BACKGROUND

On April 21, 1993, a jury in the Superior Court of Alamance County convicted Petitioner of first-degree murder, felonious child abuse, and assault on a female for the August 25, 1991 killing of four-month old Tarissa Sue O'Daniel (Susie).[2] The jury recommended a death sentence for the murder conviction, and the judge imposed that recommendation. (Recommendation (Doc. 28) at 1.) The state supreme court affirmed the conviction and sentence on September 8, 1995, State v. Burr, 341 N.C. 263, 461 S.E.2d 602 (1995), and the Supreme Court of the United States denied a petition for certiorari, Burr v. North Carolina, 517 U.S. 1123 (1996). (Recommendation (Doc. 28) at 2)

Petitioner then filed a Motion for Appropriate Relief (MAR) in the Alamance County Superior Court on September 27, 1996. (Id. at 2.) The court granted the State's motion for summary denial on October 3, 1997. (Id.) The North Carolina Supreme Court remanded the case for reconsideration on July 29, 1998. (Id.); State v. Burr, 348 N.C. 695, 511 S.E.2d 652 (1998). The superior court again denied the MAR on June 15, 2000. (Recommendation (Doc. 28) at 2.) The state supreme court

---

[2]The court has drawn the factual history of the case, except where otherwise cited, from the Magistrate Judge's original Order and Recommendation of December 14, 2004, (Doc. 28).

affirmed the denial on October 9, 2000. State v. Burr, 352 N.C. 677. 545 S.E.2d 439 (2000).

Petitioner filed his habeas petition in this court on April 12, 2001. (Recommendation (Doc. 28) at 3.) In his petition, Petitioner alleged twenty-four grounds for relief, including two claims for ineffective assistance of counsel ("IAC"), arguing that (1) trial counsel were constitutionally ineffective because they failed to develop exculpatory evidence of accidental death, and (2) trial counsel were not adequately prepared. (Id.) Petitioner also included a claim that the trial court had committed constitutional error by failing to grant Petitioner a continuance for further trial preparation. (Id.) In his original analysis of Petitioner's claims, the Magistrate Judge determined that these three contained Petitioner's "primary contentions," which alleged that Petitioner's trial counsel were not able to and did not develop a theory of the case that the cause of Susie's death was an accidental fall she suffered on the day before her death. (Id. at 5-6.)

According to the evidence presented at trial, Petitioner, while he was estranged from his wife, began dating Lisa Porter Bridges, Susie's mother, when Susie was a few weeks old. (Id. at 7.) Upon discovery of this affair, John O'Daniel, Bridges' husband, demanded a divorce, and Bridges and her four children

moved into a trailer located behind a trailer owned by Bridges'
step-brother, Donald Wade. (Id.) Near the end of June 1991,
Petitioner moved into the trailer with Bridges and her children.
(Id.) The trailer was not connected to a power grid, so to get
electricity, Bridges and Petitioner had run extension cords into
the trailer from a nearby pole with an outlet. (Trial Tr. (Vol.
17) at 49-50, 53, Mar. 29, 1993.)[3]

Bridges testified that the relationship with Petitioner
began well, but that after he moved into the trailer, he became
physically and verbally abusive toward her. (Recommendation
(Doc. 28) at 7.) Bridges and Petitioner also began to argue a
great deal. (Trial Tr. (Vol. 17) at 88-89, 93, 107-10.) On
August 24, 1991, Bridges and Petitioner spent most of the day
arguing because Petitioner had spent the previous night at his
wife's apartment. (Recommendation (Doc. 28) at 7.) While Bridges
tended the baby and her older children played around the yard
between the two trailers, Petitioner did general maintenance
work in and around the trailer. (Trial Tr. (Vol. 17) at 119-20.)

Eventually, Bridges grew tired of arguing and decided to
spend some time in her brother's trailer. (Id. at 121-22.) She
asked her seven-year-old son, Scott Ingle, to carry Susie up the

---

[3] Transcript citations refer to the Jury Trial Transcript
filed manually with the Respondent's motion to dismiss. (See
Doc. 8; Docket Entry 05/11/2011.)

small hill to the trailer. (Recommendation (Doc. 28) at 7; Trial Tr. (Vol. 17) at 121.) On the way up, Scott tripped over the extension cord on the path and fell to the ground with Susie. (Id.; Trial Tr. (Vol. 17) at 122.) Importantly, Scott testified that Susie never actually hit the ground, but that he cradled her in his arms as he fell to his knees. (Trial Tr. (Vol. 20) at 866-68, Apr. 1, 1993.) After the fall, Bridges and Petitioner checked Susie for injuries and, finding only redness on her arm, soothed her from the shock and continued about their day. (Recommendation (Doc. 28) at 7; Trial Tr. (Vol. 17) at 123-26.)

Petitioner spent the rest of the evening mowing the lawn, while Bridges cared for her children. (Id.; Trial Tr. (Vol. 17) at 127.) At some point during the evening, after more bickering, Bridges started to walk up to her brother's trailer, and Petitioner struck her in the back. (Id.; Trial Tr. (Vol. 17) at 133.) They both went into the brother's trailer and argued. (Id.) When they returned to Bridges' trailer, they were still arguing as Bridges placed Susie in an infant swing in the front room. (Id.) Petitioner then pushed Bridges onto the couch, narrowly missing the swing. (Id.) Petitioner held Bridges down on the couch and attempted to prevent her from leaving the room. (Id. at 8.)

Eventually, Bridges went into the bedroom. (Id.) Petitioner followed her and pushed her down onto the waterbed, causing the base to break. (Id.) The couple started to repair the base of the waterbed, when Susie began to cry. (Id.) Bridges retrieved Susie, calmed her, and placed her on the waterbed. (Id.) She then helped her sons Scott and Tony prepare for bed. (Id.) After she got Susie to fall asleep, she placed her in her baby bed in the bedroom and went back to her brother's trailer so that she could wash dishes. (Id.) She testified that when she left the trailer, Petitioner was working on a plug in the living room, and Susie had no marks on her. (Id.)

Scott testified that while his mother was away, he awoke to "hammer noises" and heard Susie crying. (Id.) He also heard Petitioner mumbling. (Id.) Then Susie stopped crying. (Id.)

Bridges returned to her trailer after forty-five minutes to find Susie in the infant swing in the living room. (Id.) She also found the Petitioner pacing; he told her to look at Susie. (Id.) Petitioner explained that he had moved Susie to the swing when she awoke crying and that he had seen bruises and grease spots on her when he moved her. (Id.) When Bridges attempted to clean off the grease, she discovered that the spots were instead bruises in Susie's ears, under her neck, and on her arms and

legs. Id. She also noticed that Susie's eyes did not "look right" and that the child was unresponsive. (Id.)

Bridges was worried and suggested that they take Susie to the hospital, but Petitioner refused. (Id. at 8-9.) Bridges instead called a hospital from her brother's trailer and was advised to bring Susie in for an examination. (Id. at 9.) Bridges then convinced Petitioner to drive them to the hospital by threatening to call an ambulance. (Id.) On the way to the hospital, while Susie was "jerking," Petitioner stopped to get gas in his truck. (Id.)

At 2:55 a.m. on August 25, 1991, Susie was admitted to the Alamance County Hospital, where she was examined and treated by Dr. Will Willcockson. (Id.) Dr. Willcockson observed that Susie was unconscious, with wandering eyes, and that she appeared lethargic but suffered from occasional seizures that caused twitching. (Id.) He noted that she had multiple bruises and swelling over her head, ears, face, neck, arms, and torso. (Id.) Upon having X-rays taken, the doctor discovered that both legs, both arms, and some ribs were broken. He also observed that the soft spot on her head was bulging, which indicated that her brain was swelling. (Id.) Although Bridges told Dr. Willcockson about Scott's falling with Susie the previous day, Dr. Willcockson did not believe that a fall could have produced

Susie's injuries. (Id.) He suspected that Susie had been abused and called the Alamance County sheriff's department and social services. (Id.)

Less than two and a half hours after Susie was admitted to Alamance County Hospital, doctors had her transferred by ambulance to the intensive-care unit at Memorial Hospital in Chapel Hill, where she was examined by Dr. Michael Azizkhan, chief of pediatric surgery and associate professor of surgery at the University of North Carolina. (Id. at 10.) Dr. Azizkhan observed significant bruising on Susie's neck, particularly on the left side and in a two-by-two-centimeter section under the mastoid and mandible. (Id.) He noted that the bruising on the right side of Susie's face extended onto her ear. (Id.) She also was bruised around her right arm and on her back. (Id.) Dr. Azizkhan testified that Susie had lost "half of her blood volume" and that her bones could only have broken with significant force. (Id.) He opined that her injuries were purposely inflicted. (Id.)

Professor of pediatric radiology Dr. David Merten testified regarding his analysis of Susie's X-rays. (Id.) Dr. Merten opined that the fractures in Susie's thigh bones may have been eight-to-nine days old and had to have been "produced simply by bending the knee[s] with violence, significan[t] force, forward,

and hyperextending [the knees.]" (Id.) He also discussed the fractures in Susie's shoulders, dating them as more recent than the thigh fractures and describing the bending motion it would have taken to break the arms in those places. (Id.) He testified that Susie also had a depressed skull fracture in an unusual place with brain swelling and injury; he opined that this injury took place within hours before Susie's admission to the hospital. (Id. at 10-11.)

Child neurologist Dr. Michael Tennison testified regarding Susie's depressed skull fracture, which he observed after analyzing a CT scan of Susie's head. (Id. at 11.) Noting that Susie had "multifocal intercranial injuries," as well as bleeding behind both eyes, he opined that the skull fracture was caused by "quite a force . . . by some blunt object" to the side of the head. (Id.)

The doctors could not reduce the swelling in Susie's brain, and she died at approximately 6:30 p.m. on August 27, 1991. Dr. Tennison concluded that the cause of death was brain swelling, herniation, and death caused by multiple trauma to the head. (Id.) Pathologist Dr. Karen Chancellor, who performed an autopsy, testified that Susie had multiple bruises on her neck consistent with marks caused by a hand and bruises on her cheek

consistent with marks caused by fingers. Bruises on her back and head were caused by a blunt object. (Id.)

Petitioner's evidence about the events of August 24 was nominally consistent with the State's account of the day's activities but denied any abuse of Bridges or Susie. (Id.) In describing the most crucial events of the night, Petitioner testified that he continued to repair the waterbed when Bridges went to her brother's trailer to wash dishes. (Id. at 12.) Susie was in her crib at that time, and when he looked to seek if he had awakened her with drilling noises, he noticed her eyes were open. (Id.) He then picked her up and put her in the swing in the living room, with her bottle and blanket. (Id.) Petitioner testified that when Bridges returned to the trailer, they both repaired the waterbed, then Petitioner retrieved Susie from the swing and noticed her diaper was wet. (Id.) He stated that when he picked up Susie's legs, her eyes started rolling, and he told Bridges that she was having a seizure. (Id.) Petitioner then claimed that Bridges gently shook Suzie to stop the seizure. (Id.) When they took her out of the bedroom, they noticed bruises. (Id. at 13.

Petitioner denied that he beat Susie and that he initially refused to take her to the hospital. (Id.) His defense team attempted to shift the blame to Bridges, with testimony that she

had been accused of neglect of her other children and that one witness saw her once smack Susie, causing her to fall off a couch. (Id.) Petitioner's trial counsel also suggested that a stranger may have come into the trailer and hurt Susie. (Doc. 123 at 42 (citing Trial Tr. (Vol. 27) at 2172-73, Apr. 15, 1993).) The jury did not believe Petitioner's version of the case and convicted him of Susie's murder, recommending that he be sentenced to death.

In his original Order and Recommendation, filed on December 14, 2004, the magistrate judge recommended that the court grant habeas relief on Petitioner's claim that he was deprived of his Sixth Amendment right to effective assistance of counsel during the guilt phase of his trial. (Recommendation (Doc. 28) at 16.) The magistrate judge concluded that trial counsel had "an inadvisably short period of time to prepare for a capital murder trial," particularly for a complex one with "crucial expert medical testimony," and other obstacles preventing their ability to prepare a defense. (Id. at 20-21.) The magistrate judge further concluded that trial counsel "made no significant investigation into the medical evidence regarding Susie's death," nor did they hire a medical expert to examine that evidence. (Id. at 24.) In considering the prejudice prong of the IAC analysis, the magistrate judge noted that Petitioner

had proffered expert medical opinions that Susie's death was the result of her accidental fall, aggravated by the medical condition osteogenesis imperfecta (OI), which causes a child's bones to be unusually brittle and prone to breaking. (Id. at 27.) Because trial counsel failed to investigate other medical reasons for Susie's death and thus failed to present a potentially viable defense, the magistrate judge concluded that the state MAR court's application of Strickland v. Washington, 466 U.S. 668 (1984), was unreasonable and recommended Petitioner's habeas petition be granted on the basis of IAC. (Recommendation (Doc. 28) at 30-31, 38, 44.

In response to objections and motions for discovery, the magistrate judged entered an order staying the recommendation and permitting expansion of the record on February 1, 2006. (Doc. 68). The court allowed this supplementation of the record because it found that information regarding the revocation of the medical license of one of Petitioner's experts "would cause the Court, at the very least, to afford his opinion considerably less weight than previously assigned in the Recommendation." (Doc. 123 at 2.) After both parties submitted other expert testimony, conducted additional discovery, and filed supplemental briefs, the magistrate judge filed an Order and Supplemental Recommendation on May 6, 2009. (Doc. 123.)

In the supplemental recommendation, the magistrate judge re-entered and incorporated his original recommendation, except as to his discussion of the evidence presented by the Petitioner's expert. (Suppl. Recommendation (Doc. 123) at 3.) The magistrate judge then supplemented his opinion with a discussion of the new evidence added to the record. The new evidence factored into the court's analysis of the prejudice prong of Strickland and did not change the court's original conclusion about Petitioner's having received constitutionally ineffective assistance of counsel.

After timely objections and responses and a de novo review, on May 30, 2012, this court adopted the Original Report in full and the Supplemental Report in part, (Doc. 139), ordering that the writ of habeas corpus be granted because Petitioner received constitutionally ineffective assistance of counsel. The court based its findings only on the record that was before the State MAR court, in compliance with Cullen v. Pinholster, 563 U.S. 170 (2011). The court made clear that its analysis was consistent with the "double deference" standard that should be applied to habeas corpus review of IAC claims, as highlighted in Harrington v. Richter, 562 U.S. 86 (2011).

In an unpublished, per curiam opinion, the United States Court of Appeals for the Fourth Circuit reversed the grant of

habeas corpus on March 11, 2013. <u>Burr v. Lassiter</u>, 513 F. App'x 327 (Mar. 11, 2013). (Doc. 149.) The Fourth Circuit ruled that "the district court's decision granting Burr relief is contrary to the deference that federal courts must afford state court decisions adjudicating the merits of such constitutional claims." <u>Id.</u> at 329. The court found that the State MAR court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103. It concluded that the State court's finding of no deficient performance under <u>Strickland</u> was not unreasonable and that the State court did not rule unreasonably when it rejected Petitioner's proffered evidence on OI and the fall with Scott under the <u>Strickland</u> prejudice prong. <u>Burr</u>, 513 F. App'x at 345. Concluding that the State MAR court's rejection of Petitioner's IAC claims was not unreasonable, the Fourth Circuit reversed the ruling of this court.

Following the Fourth Circuit's ruling, this court held telephone conferences with counsel, (<u>see</u> Minute Entry 03/25/2015 and 04/24/2015), to determine the appropriate process. An order was entered providing for additional briefing. (Doc. 156.) In January, 2016, oral argument was held and the remaining claims are ripe for resolution.

Because this court originally granted the petition on the basis of Petitioner's IAC claims alone, on remand, the court must consider Petitioner's remaining grounds for relief. Those claims include:

- Ground Four: The State knowingly presented false evidence and created a materially false impression regarding the facts of the case and the credibility of the witnesses, in violation of Napue v. Illinois, 360 U.S. 264 (1959). (**Brady/Napue Claims**)

- Ground Five: The State failed to reveal exculpatory evidence of other explanations for the injuries to Susie in violation of Brady v. Maryland, 373 U.S. 85 (1963). (**Brady/Napue Claims**)

- Ground Six: The State affirmatively presented the case against Petitioner in a false light. (**Brady/Napue Claims**)

- Ground Seven: Newly discovered evidence warrants a new trial.

- Ground Eight: The trial court denied Petitioner the right to counsel by ruling that defense counsel could not attempt to rehabilitate any venire-person who had been challenged by the prosecution based on that person's ability to vote for a death sentence. (**Jury-Selection Claims**)

- Ground Nine: The trial court erroneously dismissed a juror who may have been able to vote for a death sentence. (**Jury-Selection Claims**)

- Ground Ten: The trial court erroneously excluded evidence regarding Lisa Bridges.

- Ground Eleven: The trial court erroneously overruled an objection to prosecutorial misconduct. (**Prosecutorial Misconduct**)

- Ground Twelve: The trial court erroneously denied a motion to order that Lisa Bridges' medical records be made available to defense counsel.

- Ground Thirteen: The trial court erroneously allowed the prosecutor to argue beyond the facts of the case during the penalty phase of the trial. (**Prosecutorial Misconduct**)

- Ground Fourteen: The trial court erroneously overruled an objection to improper argument the prosecutor made during the penalty phase of the trial. (**Prosecutorial Misconduct**)

- Ground Fifteen: The trial court failed to give a jury instruction that adequately limited the unconstitutionally vague aggravating factor that the murder was "especially heinous, atrocious, or cruel." (**Jury-Instruction Claims**)

- Ground Sixteen: The trial court erroneously failed to prevent the prosecutor from misstating the law regarding

the aggravating circumstance found in the case.
(**Prosecutorial Misconduct**)

- Ground Seventeen: The trial court erroneously failed to instruct the jury regarding the mitigating factor that Petitioner had the ability to adjust to prison life.
  (**Jury-Instruction Claims**)

- Ground Eighteen: The trial court erroneously instructed jurors to decide whether non-statutory mitigating circumstances have mitigating value. (**Jury-Instruction Claims**)

- Ground Nineteen: The trial court erroneously instructed the jury regarding the weighing of aggravating and mitigating circumstances. (**Jury-Instruction Claims**)

- Ground Twenty: North Carolina's death penalty procedure is unconstitutional, and Petitioner's death sentence was imposed in an arbitrary and capricious manner, and constructive denial of counsel made his conviction and sentence constitutionally unreliable. (**IAC**)

- Ground Twenty-One: Trial counsel were constitutionally ineffective in their pre-trial practice. (**IAC**)

- Ground Twenty-Two: The jury was improperly death-qualified.
  (**Jury-Selection Claims**)

- Ground Twenty-Three: Trial counsel were constitutionally ineffective because they failed to develop mitigation evidence. (**IAC**)

- Ground Twenty-Four: The indictment did not include all of the essential elements of first-degree murder and did not allege the aggravating factors necessary to make Petitioner eligible for a death sentence.

The court has organized Petitioner's grounds for relief according to what the court has determined is each claim's argument. Both Petitioner and Respondent briefed the remaining issues originally and have also submitted additional briefs since the Fourth Circuit's ruling. After consideration of all of the remaining issues and arguments, the court denies the petition.

## II. <u>DISCUSSION</u>

When a habeas corpus claim has been "adjudicated on the merits in state court proceedings," a federal district court may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d); see also Williams v. Taylor, 529 U.S. 362, 412 (2000). "Clearly established Federal law" includes only "the holdings, as opposed to the dicta," of the Supreme Court of the United States. Williams, 529 U.S. at 412. A state court decision is "contrary to"-Supreme Court precedent if the state court decision either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different" from the Court. Id. at 405-06.

A state court decision involves an "unreasonable application" of Supreme Court case law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. "Unreasonable" does not mean merely "incorrect" or "erroneous." Id. at 410-11. "[E]ven 'clear error' will not suffice." White v. Woodall, 572 U.S. 415, 419 (2014) (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). "[A]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.[4]

Section 2254 provides that the state court's determination of factual issues is "presumed to be correct" and may only be overturned by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>Lenz v. Washington</u>, 444 F.3d 295, 300 (4th Cir. 2006). Additionally, a federal court "will not overturn the [trial] court's credibility judgments unless its error is 'stark and clear.'" <u>Elmore v. Ozmint</u>, 661 F.3d 783, 850 (4th Cir. 2011) (quoting <u>Cagle v. Branker</u>, 520 F.3d 320, 324 (4th Cir. 2008)).

## A.    <u>**Cronic Standard**</u>

Petitioner asserts in many of his grounds that the events leading to his trial and the decisions of the trial court constructively deprived him of his Sixth Amendment right to the assistance of counsel. He relies on <u>United States v. Cronic</u>, 466 U.S. 648 (1984), to support the argument that when a prisoner is denied counsel entirely, prejudice is presumed. In <u>Cronic</u>, the Supreme Court ruled that there are some situations in which "the surrounding circumstances ma[k]e it so unlikely that any lawyer

---

[4] "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." <u>Harrington</u>, 562 U.S. at 102.

could provide effective assistance that ineffectiveness was properly presumed without inquiry into actual performance at trial." Id. at 661. Cronic describes some of those circumstances, including a complete denial of counsel at "a critical stage of [the] trial," a failure "to subject the prosecution's case to meaningful adversarial testing," and a denial of "the right of effective cross-examination." Id. at 659. Specifically, the Court cited Powell v. Alabama, 287 U.S. 45 (1932), in which the trial court appointed, on the first day of a highly publicized trial, counsel from out of state who had not prepared the case or familiarized himself with local procedure. Id. at 660. The Court then determined that petitioner Cronic did not meet these demanding standards, even though his counsel was a young real-estate lawyer who was trying his first jury case and who only had twenty-five days to prepare a defense in a check-kiting case that involved thousands of documents. Id. at 649-50, 666. Cronic sets forth a very difficult standard to achieve.

Petitioner points to the following facts to support his Cronic claims: (1) his first appointed trial attorneys did virtually "no investigation or trial preparation," logging only fifty-one hours of preparation, in the sixteen months before they were replaced a month before trial; (2) his second set of

attorneys, who represented him at trial, only had two months to prepare to try the case; and (3) the court refused to grant a continuance to his attorneys when they asserted a need for further time to prepare the case. (Doc. 12 at 9-11.)[5]

Respondent argues that Petitioner did not fairly present his Cronic claims to the State courts and therefore has not exhausted them. (Doc. 11 at 5.) For a federal habeas court to have jurisdiction to consider a petitioner's claim, the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The Supreme Court has emphasized the importance of exhaustion to habeas cases:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). A petitioner satisfies the exhaustion requirement by "'fairly present[ing]' his claim in each appropriate state court . . . thereby alerting

---

[5]  All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

that court to the federal nature of the claim." <u>Baldwin v.</u>
<u>Reese</u>, 541 U.S. 27, 29 (2004) (quoting <u>Duncan v. Henry</u>, 513 U.S.
364, 365-66 (1995)). To present the claim fairly, the petitioner
must allege "both the operative facts and the controlling legal
principles" before the state court. <u>Jones v. Sussex I State</u>
<u>Prison</u>, 591 F.3d 707, 713 (4th Cir. 2010). Failure to exhaust
claims by allowing the state court an opportunity to rule on the
claim requires a federal court to dismiss those claims as
procedurally defaulted. <u>See</u> <u>O'Sullivan</u>, 526 U.S. at 848 (citing
<u>Coleman v. Thompson</u>, 501 U.S. 727, 731-32 (1991)).

To the extent that any of Petitioner's grounds for relief
rely on the <u>Cronic</u> standard of presumed ineffective assistance
of counsel, this court finds that Petitioner did not present
them as such to any state court. Petitioner relies on <u>Cronic</u> and
the effective denial of counsel in Grounds Twenty through
Twenty-Three. Petitioner presented the last three of those
claims as standard <u>Strickland</u> claims to the state MAR court,
which denied them on their merits. Ground Twenty is an overall
<u>Cronic</u> claim that Petitioner never presented to any state court.
Because Petitioner did not "give the state courts one full
opportunity to resolve any" of his <u>Cronic</u> claims, they are not
exhausted and have been procedurally defaulted by the
Petitioner.

**B.  IAC Claims Decided by the Fourth Circuit**

The Fourth Circuit reversed this court's ruling on Petitioner's claims that his trial counsel provided constitutionally ineffective assistance. Burr, 513 F. App'x at 329. Those claims encompassed Grounds One, Two, and Three. Consequently, the court denies Grounds One, Two, and Three.

**C.  Brady/Napue Claims**

Petitioner makes a series of interconnected claims regarding the prosecutor's alleged withholding of evidence and subsequent manipulation of evidence that implicate the principles elucidated in Brady v. Maryland, 373 U.S. 83 (1963), and Napue v. Illinois, 360 U.S. 264 (1959). In Brady, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady, 373 U.S. at 87. Favorable evidence includes evidence that could be used to impeach a witness's credibility. Giglio v. United States, 405 U.S. 150, 154 (1972). Evidence is "material" under the Brady standard "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-70 (2009). Evidence must be disclosed when it "could reasonably be taken to put the whole case in such a

- 24 -

different light as to undermine confidence in the verdict."
Kyles v. Whitley, 514 U.S. 419, 435 (1995).

Napue stands for the proposition that a conviction cannot
be obtained by false evidence, where the prosecutor knew a
witness testified falsely and did nothing to correct the
testimony. Napue, 360 U.S. at 269. The case involved a murder
conviction obtained in part through the testimony of one of the
defendant's accomplices. Id. at 265. When asked if he had
received any promise of consideration in exchange for his
testimony, the witness responded that he had not. Id. The
prosecutor had indeed promised that he would recommend a
reduction in the accomplice's sentence, but he did not correct
the witness's testimony to the contrary. Id. at 265-66. The
Court ruled that "when the State, although not soliciting false
evidence, allows it to go uncorrected when it appears," due
process requires the conviction to be reversed, if that
conviction was obtained using that false evidence. Id. at 269.

### 1.    **Ground Four**

In Ground Four, Petitioner claims that the prosecutors
withheld recordings of pretrial interviews the police and
prosecutors conducted with Scott Ingle and Lisa Bridges. (Doc. 2
at 14.) Petitioner argues these recordings reveal material
impeaching evidence not included at trial and demonstrate that

the prosecutors manipulated the testimony of Scott and Bridges
to fit their theory of the case, in violation of Napue. (Id. at
15.) Petitioner also alleges that Bridges was promised immunity
and then lied about that promise on the witness stand. The State
MAR court should have thus granted relief under Giglio, 405 U.S.
at 155 (reversing conviction because the prosecution failed to
disclose a promise of immunity to a witness, which was relevant
to that witness's credibility).

　　According to Petitioner, prosecutors interviewed Bridges on
February 24, 1993. (Doc. 10 at 43.) During that interview, he
asserts that prosecutors attempted to manipulate Bridges'
testimony regarding Susie's poor health before her death,
Petitioner's good relationship with Susie, and Bridges' attempts
to get her family members to lie about Susie's condition. (Id.
at 44-45.) Petitioner also claims that the prosecutors offered
Bridges immunity in exchange for her testimony, a deal she
denied existed during cross-examination. (Id. at 44.) Petitioner
argues that the statements Bridges made to the prosecutors in
the 1993 interview contradicted statements she had given to the
police in 1991, shortly after Susie's death. (Id. at 45.) Before
cross-examining Bridges, Petitioner claims that his counsel
moved, consistent with N.C. Gen. Stat. § 15A-903(f), for

Bridges' prior statements, but did not receive the 1993 recording. (Id.)

Petitioner also argues that the State withheld recorded statements by Scott Ingle to prosecutors, made on February 25 and 26, 1993. (Id. at 46.) Scott was eight years old when Susie died and had turned ten by the time of this interview. (Id.) Petitioner claims that the transcript of the interview reveals that Scott did not remember what happened in 1991 and that his account of his fall with Susie differed from the testimony he gave at trial. (Id.) He argues that the prosecutors coached Scott in his testimony and manipulated him to testify to facts that best fit their theory of the case. (Id. at 46-47.) Petitioner argues that the withheld statements were material to the matters of both guilt and the credibility of Bridges and Scott. (Id. at 48.)

Respondent asserts that the State MAR court did not unreasonably apply Brady in this claim because:

> (a) trial counsel never obtained a court order directing disclosure of these items, (b) the prosecutors did not believe that either the tapes or the typed version of the comments therein contained Brady material, and (c) the prosecutors believed that the tapes and typed version of the comments therein were "work-product" nor required to be disclosed to trial counsel under state law.

(Doc. 7 at 11.) Respondent also argues that the statements from Bridges and Scott do not qualify as material or as impeachment

evidence under the Brady standard. (Doc. 11 at 22-23.) The prosecutors, they argue, were simply preparing each witness for trial and encouraging them to tell the truth. (Id.) Respondent asserts that any differences in these statements and the trial testimony were de minimus and do not undermine the testimony the jury heard. (Id. at 23.) Respondent also makes it clear that the prosecutors never promised Bridges immunity in exchange for any type of testimony. (Id. at 27.) Respondent concludes with an argument that Petitioner cannot demonstrate that he was prejudiced by not receiving transcripts of the statements, especially given the overwhelming expert evidence regarding the cause of Susie's death and the fact that he also testified. (Id. at 28.)

The state MAR court denied this claim on the merits. The court acknowledged that the prosecution did not turn over the recordings or the transcripts of these interviews before or during trial. State v. Burr, Order and Memorandum Opinion, Nos. 91-CRS-21905, -06, -08, -09, 26 (Superior Court of Alamance County June 15, 2000) [hereinafter Second MAR Order (Doc. 162-4) at 118-85]. In response to the Napue claim, the court concluded that the transcripts of the interviews showed that the prosecutors were appropriately preparing their witnesses to testify and encouraging them to tell the truth. (Id. at 158.)

Furthermore, any inconsistencies between the statements given to the prosecutors and the trial testimony were not material: the prosecutors did not encourage perjury, nor did they fail to correct perjury, because no perjury was committed. (_Id._ at 159.) With regard to the _Brady_ claim, the state court concluded that the information in the undisclosed statements was not material, in that disclosure would not have resulted in a reasonably probability that the outcome of the trial would have been different. (_Id._) The Petitioner, according to the court, did not suffer a violation of his due process rights because of the prosecution's treatment of this evidence. (_Id._)

The Antiterrorism and Effective Death Penalty Act ("AEDPA") demands a federal court sitting in habeas-corpus review of a state conviction to presume that the factual findings made by the state review are correct unless proven otherwise by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). In regards to this claim, the state MAR court reviewed the transcripts offered as impeaching _Brady_ material and made several factual findings, including that: Bridges did not state in her pre-trial statements or trial testimony that she ever saw Petitioner hurt Susie, (Second MAR Order (Doc. 162-4) at 160); Susie's pre-injury health conditions were the subject of extensive trial testimony, (_id._); when preparing the witnesses for trial, the

prosecutors did a thorough job of challenging them, but repeatedly emphasized the importance of telling the truth, (id.) at 161-62; Bridges was not offered immunity in exchange for her testimony, (id. at 163); the prosecutors did not encourage Bridges to give false testimony, (id. at 164); Bridges was thoroughly cross-examined on any inconsistencies in her testimony, not requiring the prosecutors to correct any false testimony, (id. at 164-65); inconsistencies in Scott's testimony and pre-trial statements were explained by Scott during testimony and on cross-examination, (id. at 165-66); prosecutors repeatedly encouraged Scott to tell the truth to the court, (id. at 166-67); prosecutors did not lead Scott through his testimony so that he would implicate Petitioner, (id. at 169-71); and a medical expert testified that there was medical evidence of a shaking injury beyond a shake impact, (id. at 174.)

Petitioner has not provided clear and convincing evidence that the state court's factual findings are incorrect. This court has reviewed the trial testimony and cross-examination of Lisa Bridges and Scott Ingle, as well as the transcripts of the interviews of these witnesses conducted in both 1991 and 1993, and can find no evidence to undermine the MAR court's factual conclusions. The prosecutors were insistent in their attempts to determine the truth about Susie's health and Bridges'

relationship with Petitioner; nonetheless, they repeatedly encouraged Bridges to tell the truth on the witness stand, no matter how bad that truth made her look as a parent. (See Doc. 159-1 at 5, 8, 20-21.) The unreleased interview of Ingle likewise contains no evidence that belies the state court's determinations. The state court's conclusions that the undisclosed evidence was neither material under Brady nor violative of Napue, therefore, are not unreasonable determinations or fact or clearly established federal law. Ground Four is denied.

### 2. Ground Five

Petitioner asserts that the prosecution violated Brady by withholding eleven research articles regarding child abuse, accidental injury, and OI. (Doc. 2 at 15.) Petitioner claims that these articles were material because they would have provided his trial counsel with a more effective strategy to combat the State's case: namely, that the cause of Susie's death was the result of an accidental fall, not child abuse. (Id. at 15.) Petitioner further claims that the State violated Brady by choosing not to call Nita Todd, a social worker who interviewed Petitioner on August 24, 1991. (Id. at 16.) In the brief supporting his petition, however, Petitioner claims that the State violated Brady by withholding recordings of interviews

conducted by the prosecutors of Scott Ingle and Lisa Bridges.
(Doc. 10 at 41.)[6]

Respondent replies simply that the State MAR court was not
unreasonable when it determined that the journal articles and
information provided by Todd were not Brady material. (Doc. 7 at
13.) Respondent also disputes Petitioner's claim that he
specifically requested all of the prior statements of Bridges
prior to cross-examination, instead pointing out that
Petitioner's trial counsel only requested the tape recording of
an August 26, 1991 interview conducted by the police. (Doc. 11
at 22.)

The State MAR court denied this claim on the merits. State
v. Burr, Order, Nos. 91-CRS-21905, -06, -08, -09, 114 (Superior
Court of Alamance County Oct. 3, 1997) (included as an exhibit
at Doc. 162-4) [hereinafter First MAR Order (Doc. 162-4) at
2-117]. The court ruled that the eleven articles from medical
journals "were not evidence, were materials within the public
domain available to anyone researching the field[,] and the
State was under no obligation to provide defendant's counsel

---

[6] Because Ground Four asserts the Brady claim regarding the
withheld interview recordings, this court will treat the
addition of the interview claim to this ground as a clerical
error and will not address it here. The court has considered any
additional argument Petitioner makes about this claim under the
Ground Five subheading as argument relating to Ground Four.

copies of the medical journal articles while preparing for trial." (Id. at 115.) The court concluded that the articles were not Brady material because, as part of the public domain, they could have been discovered with due diligence by trial counsel. (Id.) Similarly, the court ruled that the information provided by Todd was not Brady material because defense counsel had access to Todd before the trial. (Id.) Finally, the court held that the information contained in the articles and given by Todd was not material to the outcome of the case. (Id. at 115-16.)

The state court did not apply Brady unreasonably in its resolution of this claim. Petitioner has provided no evidence that shows that he was not able to access research articles available to everyone prior to trial, nor does he prove that he was denied access to Todd before the trial. The prosecution had no duty to disclose evidence that was not exclusively in its possession. "'[T]he Brady rule does not apply if the evidence in question is available to the defendant from other sources.'" United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) (quoting United States v. Davis, 787 F.2d 1501, 1505 (11th Cir.), cert. denied, 479 U.S. 852 (1986)). For this reason, Ground Five is denied.

### 3.  **Ground Six**

In Ground Six, Petitioner avers that by withholding the articles and witness mentioned in Ground Five, the prosecution presented its case in a materially false light. (Doc. 2 at 16; Doc. 10 at 53.) The State MAR court denied this claim on its merits. (First MAR Order (Doc. 162-4) at 115.) The court concluded that, in light of the overwhelming evidence presented by medical experts of the cause of Susie's death, "the prosecutors could not be rationally argued to have made a misrepresentation as to the nature and cause of the injuries to the infant victim." (Id. at 116-17.)

In his brief supporting his Petition, Petitioner refers the court to his arguments in Grounds Four and Five but offers no explanation of how Ground Six is, itself, a separate ground for relief. Because the court has denied Grounds Four and Five, and Ground Six does not appear to be distinct from either of those grounds, Ground Six is denied.

### D.  **Ground Seven: Newly Discovered Evidence**

Ground Seven alleges that all of Petitioner's evidence concerning OI and accidental short-fall death that he collected post-conviction amounts to newly discovered evidence that justifies giving Petitioner a new trial. (Doc. 2 at 17.) He claims that Townsend v. Sain, 372 U.S. 293 (1963), supports this

ground for relief because his claim of actual innocence based on this newly discovered evidence is accompanied by an independent constitutional violation in his trial. (Doc. 10 at 53 (citing Townsend, 372 U.S. at 317).) The underlying constitutional violation he claims is his constructive denial of counsel as understood by Cronic, which prevented his trial counsel from discovering this evidence. (Id.) Petitioner claims that the state MAR court's denial of this claim without an evidentiary hearing was unreasonable. (Id.) Further, Petitioner argues that because the state court did not recognize the underlying Sixth Amendment claim, it did not adjudicate this claim on the merits, and this court's review should be de novo. (Id. at 54.)

Respondent asserts that the North Carolina Supreme Court has established a seven-part test to determine whether evidence qualifies as newly discovered evidence, and Petitioner's proffered evidence does not pass that test. (Doc. 11 at 38.) Additionally, Respondent points out that federal habeas courts generally do not rule on state courts' determinations regarding the admissibility of evidence. (Id.)

The State MAR court denied this claim on the merits. (First MAR Order (Doc. 162-4) at 114.) After providing a thorough review of North Carolina law regarding whether newly discovered evidence should warrant a new trial and an even more thorough

review of the medical evidence presented at trial and the newly proffered evidence (including a review of other state cases that dealt with similar medical evidence), the court evaluated Petitioner's proffer of new evidence according to the standards set forth by the North Carolina Supreme Court. (See id. at 15-52.) Ultimately, the court did not believe the evidence proffered by the Petitioner that Susie had OI and that her cause of death was an accidental fall compounded by the OI. (Id. at 62.) The court concluded that Petitioner had not proven that (1) the State's experts never considered OI in evaluating Susie's injuries and cause of death, (2) Susie had any of the symptoms common among children with OI, (3) Susie had any family history of OI, and (4) Susie's brain injury could have been caused by the fall with Scott as described to the jury.[7] (Id. at 55-62.)

The court used a four-part test to determine that Petitioner was not entitled to a new trial: namely, (1) whether the proffered evidence was "probably true," (2) whether the defendant, exercising due diligence, could have discovered the evidence at the time of the trial, (3) whether the evidence would not tend only to contradict or impeach the witnesses who testified at trial, and (4) whether the evidence was of such a

_____

[7] The court determined that the injury would have caused her to lose consciousness fairly soon after its cause.

nature to demonstrate that a different result would probably have been reached at trial. (<u>Id.</u> at 62.) The court concluded that Petitioner's proffer failed all four parts of the test. It thus rejected the new evidence claim. (<u>Id.</u>)

Petitioner appears to be arguing that this court should look at this ground for relief with fresh eyes because the state MAR court somehow did not recognize the underlying constitutional error — embodied in a <u>Cronic</u> claim that he never presented to that court — that would allow him to bring this claim regarding his actual innocence in a federal habeas court. To the extent that Petitioner's claim regarding his new evidence relies on the <u>Cronic</u> claim as a vehicle to earn federal habeas review via <u>Townsend</u>, that ground for relief is unexhausted and, as such, has been procedurally defaulted. Without the underlying constitutional claim, Petitioner has asserted a claim that this court cannot review. <u>See</u> <u>Herrera v. Collins</u>, 506 U.S 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). Finally, if Petitioner is attempting to use his actual innocence claim as the gateway to assert his <u>Cronic</u> claim, he would have to "show that it is more likely than not that no reasonable

juror would have convicted him in light of the new evidence."
Schlup v. Delo, 513 U.S. 298, 327 (1995). The Fourth Circuit's
rejection of the prejudice prong of Petitioner's Strickland
claim that his trial counsel were ineffective for failing to
discover and present the evidence at issue in this ground for
relief to the jury precludes a Schlup determination in
Petitioner's favor. Burr, 513 F. App'x at 345. Ground Seven,
therefore, is denied.

### E.    Jury Selection Claims

#### 1.    Ground Eight

In Ground Eight, Petitioner claims that the trial court
prevented him from having a fair and impartial jury and from
receiving the effective assistance of counsel by prohibiting
defense counsel from rehabilitating those potential jurors who
were excused for cause because they expressed an inability to
vote for the death penalty. (Doc. 2 at 17.) Petitioner argues
that this failure to question these venire members adequately
about their ability to follow the law violated Witherspoon v.
Illinois, 391 U.S. 510 (1968), and Adams v. Texas, 448 U.S. 38
(1980). (Doc. 10 at 55.)

The State MAR court rejected this claim on the merits and
as procedurally defaulted. (First MAR Order (Doc. 162-4) at
102.) The court reviewed the voir dire transcript of each

potential juror Petitioner cites as improperly excused and
concluded that the trial court itself conducted an appropriate
questioning of each juror's ability to follow the law versus his
or her opposition to the death penalty. (Id. at 103-04.) The
court similarly reviewed the extensive voir dire of those
jurypersons accepted and determined that the trial court's
review of potential jurors did not violate Witherspoon or Adams.
(Id. at 103-06.)

In Witherspoon, the Supreme Court held that a trial court
violated a defendant's due process rights when it excused for
cause potential jurors who "voiced general objections to the
death penalty or expressed conscientious or religious scruples
against its infliction." Witherspoon, 391 U.S. at 522. Instead
of "exclud[ing] only those prospective jurors who stated in
advance of trial that they would not even consider returning a
verdict of death," the court put together "a jury uncommonly
willing to condemn a man to die" by not allowing further
questioning of those venire members who showed some hesitancy
toward the death penalty. Id. at 520-21. Witherspoon thus stands
for the principle that a court must make the effort to discover
whether a potential juror who expresses opposition to the death
penalty can nonetheless follow the law and the juror's oath.
Id. at 519. Adams made Witherspoon applicable to bifurcated

capital proceedings and re-emphasized that a "State may bar from jury service [only] those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." Adams, 448 U.S. at 45, 50.

Based on a review of the transcript of voir dire, this court cannot conclude that the state MAR court unreasonably applied Witherspoon or Adams. Petitioner first complains that the trial court acted in contravention of Witherspoon by denying his motion for individual voir dire of those potential jurors who were excused for cause because of their views on the death penalty. Although the court denied that motion, it granted Petitioner's motion for more general individual voir dire. (Jury Selection Tr., 102 (Mar. 1, 1993).) The court denied the more specific motion in light of North Carolina law that prohibited rehabilitation of jurors who "state[] unequivocally . . . that [their] ability to serve on the case would substantially be impaired by [their] views on the death penalty." (Id. at 88.) Standing by itself, the decision of the trial court to abide by state law does not contradict either Witherspoon or Adams' instructions that a court may only exclude for cause those potential jurors whose opinions about the death penalty would prevent them from following the law or obeying their oaths as jurors. An unequivocal statement from a venireperson that he or

she could do neither is an appropriate ground to be excused for cause. Read in context of the entire jury selection voir dire, the denial of the motion did not hinder the court's ability to determine who would make appropriate jurors in light of <u>Witherspoon</u> and <u>Adams</u>.

Furthermore, this court's review of the lengthy jury selection process reveals that the trial court exercised considerable care to abide by both <u>Witherspoon</u> and <u>Adams</u> and to ensure that a fair jury was seated. Jury selection in Petitioner's case took around four weeks. (<u>See</u> Jury Selection Tr. at 1-3251.)[8] The parties and the court reviewed just under one hundred potential jurors, as reflected in the 3,251-page voir dire transcript. (<u>Id.</u>) From the juror pool, the court excused fifty-three potential jurors for cause, twenty-five of whom expressed an inability to follow the law regarding the death penalty and do their duty as jurors. (<u>Id.</u>) A total of thirty-eight potential jurors expressed either ambivalence about or opposition to the death penalty. (<u>Id.</u>) Of those concerned about the death penalty, fifteen expressed unequivocal opposition to capital punishment and stated that their beliefs

---

[8] Transcript citations refer to the Jury Selection Transcript filed manually with the Respondent's motion to dismiss. (<u>See</u> Doc. 8; Docket Entry 05/11/2011.)

would substantially impair their ability to follow the law and their duty as jurors.[9]

A review of the individual voir dire of the potential jurors who expressed ambivalence about the death penalty shows that either the prosecutor or the court, both with and without the prompting of defense counsel, took care to explain the death penalty process to those potential jurors and to probe their thoughts and feelings about the death penalty more closely than they did to those jurors who expressed a fixed opinion about capital punishment. (See, e.g., Jury Selection Tr. at 2731-40.)

Three of the ambivalent venire members were seated on the jury after further questioning. Adam Fuller was the first potential juror to express some ambivalence about his ability to impose a death sentence. (Id. at 286.) Mr. Fuller initially stated that he would follow the law as explained by the judge and expressed a belief in and willingness to impose the death penalty. (Id. at 285, 317.) As questioning advanced, however, he asked to return to a discussion of punishments: "About the death

_____

[9] The State prosecutors, in conducting voir dire, were following state law guidelines, inspired by Wainwright v. Witt, 469 U.S. 412 (1985), that allowed removal of jurors for cause if they expressed that their opinions regarding capital punishment "would prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions of [their] oath." Wainwright, 469 U.S. at 424 (quoting Adams, 448 U.S. at 45).

penalty, could I go back to that a minute?" (Id. at 323.)

Mr. Fuller then explained his position as a deacon in his church

and his belief in the fifth commandment, expressing significant

hesitation about his ability to impose the death penalty:

> Now I believe in — that we shouldn't kill, but—and
> then I think about the — the law of the land, that
> when we do wrong we shall be punished for it, so it's
> kind of, you know, got me tied up there in between
> two, so I — what I'm saying if I believe — I believe
> that if you do wrong you shall be punished, but as far
> as the death penalty, I really restrict that, I—I
> don't believe — I don't think we should kill. I don't
> think that I have a right to kill, you know, anybody.

(Id. at 323-24.) After this admission, the prosecutor continued

to question Mr. Fuller about his ability to vote for a death

sentence and elicited a couple of conflicting responses. (Id. at

324-26.) The prosecutor then moved to have Mr. Fuller excused

for cause. (Id. at 327.) The court took over questioning, and

Mr. Fuller made it clear that he would be able to vote for a

death or a life sentence and to follow the law, so the court

denied the motion. (Id. at 327-29.) Ultimately, he was seated on

the jury. (Id. at 345.)

Similarly, Janet Bunch expressed discomfort with the death

penalty and did not believe that it was a necessary law. (Id. at

1404.) Ms. Bunch's first responses to questioning about the

death penalty were confusing: she first stated that she was not

opposed to the punishment but did not believe it to be "a

necessary law" and did not favor it. (Id. at 1465.) She stated, however, that her beliefs regarding the death penalty would not substantially impair her performance as a juror. (Id.) After several personal questions, the prosecutor established that Ms. Bunch was having difficulty with the fact that the case involved the murder of a child. (Id. at 1411-14.) Then he returned to the death penalty and carefully explained the sentencing process. (Id. at 1440-47.) Ms. Bunch mentioned that she did not "want to really be responsible" for the decision to sentence someone to death, but she agreed that she could follow the law. (Id. at 1447-48.) Although she explained that she was "not particularly fond of a life for a life," Ms. Bunch stated that she would not automatically vote against the death penalty. (Id. at 1449-50.) She also confirmed that her views on the death penalty would not substantially impair her performance as a juror. (Id. at 1452.) The prosecutor asked her again if she could do her duty and follow the law, and she agreed repeatedly that she could. (Id. at 1455-56.) She was seated on the jury. (Id. at 1476.)

Throughout voir dire, attorneys for both sides and the court questioned the jurors about their views on the death penalty and their ability to follow the law. By confirming that jurors could apply the law and that their individual beliefs

regarding the death penalty would not substantially impair their ability to serve as jurors, the court complied with the requirements of both <u>Witherspoon</u> and <u>Adams</u>. The MAR court did not unreasonably apply these federal laws when it denied this juror-selection claim. Ground Eight is denied.

### 2. <u>Ground Nine</u>

Petitioner argues that the trial court erred by excusing a prospective juror for cause when she asserted that she could follow the law and consider a death sentence during the death-qualifying portion of voir dire. (Doc. 2 at 18.) According to Petitioner, excluding this juror violated the principles articulated in <u>Witherspoon</u> and <u>Adams</u>. (Doc. 10 at 55.) Petitioner does not name this juror in his initial Petition or supporting brief, but in his additional, post-Fourth Circuit brief outlining as-yet unbriefed issues, he identifies her as Mary Ervin. (Doc. 163 at 6.) After a searching review of the voluminous jury-selection transcript, the court has identified additional potential jurors to whom Petitioner could have been referring. The exclusion of all of these jurors, however, was consistent with both <u>Witherspoon</u> and <u>Adams</u>.

Ms. Ervin stated that she was opposed to the death penalty, but immediately followed with the assurance, "I'd abide by the law." (Jury Selection Tr., 1963-64.) She explained that she had

changed her position on the death penalty, but that she would not be substantially impaired as a juror, and in some cases, she could vote for a death sentence. (Id. at 1965-66.) After some questioning on other subjects, the prosecutor resumed asking Ms. Ervin how her views on the death penalty might affect her as a juror. (Id. at 1978, et seq.) She indicated throughout his explanation of the sentencing process that she could follow the law. (Id. at 1980-81.) Ultimately, however, she stated that she could not vote for a death sentence. (Id. at 1982.) Then, after further questioning, she changed her mind and said she could vote for the death penalty and would not automatically vote against it. (Id. at 1983.) She averred that she could follow the law. (Id. at 1986.) The prosecutor continued to question her; again she changed her mind to confirm that she would automatically vote for a life sentence. (Id. at 1987.)

Ms. Ervin became very confused during the prosecutor's questioning. She agreed that she would automatically vote against the death penalty, but then stated that her beliefs would not impair her ability to follow the law. (Id.) When the prosecutor asked for clarification, she stated, "I would vote for the death penalty, yes." (Id. at 1988.) After a recess, the prosecutor attempted to get a definitive answer on Ms. Ervin's ability to serve impartially by asking, "Are your views on the

death penalty such that they will impair substantially, make it very difficult for you to serve on this case?" (Id. at 1989.) Ms. Ervin responded in the affirmative. (Id.) She next agreed that her beliefs "would make it very difficult for [her] to follow the law if it required that [she] come to the point where [she would] vote to impose the death penalty." (Id.) Finally, she admitted that she would automatically vote for a life sentence. (Id. at 1990.)

After the prosecution moved to excuse Ms. Ervin for cause, the trial court heard the defense's argument supporting the objection. (Id.) The defense correctly pointed out that, despite Ms. Ervin's reluctance to participate in the capital sentencing process, she repeatedly stated that she could follow both the law and the judge's instructions. (Id. at 1991.) The court, noting its observation of Ms. Ervin's demeanor and her answers to the many questions posed, ruled in its discretion to remove her for cause, consistent with Wainwright and Adams. (Id. at 1994.)

This court sees no abuse of discretion by the trial court in this situation. The judge was in a better position to judge Ms. Ervin's demeanor and to evaluate her true feelings in light of her inconsistent answers to the prosecutor's many questions. See Skilling v. United States, 561 U.S. 358, 386 (2010)

("Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty."). The MAR court did not apply federal law unreasonably when it deemed this decision to be valid.

Venire member Lynda Harden initially expressed opposition to the death penalty, but she insisted that she could follow the law and perform her duty as a juror to impose a death sentence if the law required it. (Jury Selection Tr. at 695, 699, 707.) She then expressed ambivalence toward the punishment, saying that she had recently changed her position regarding it. (Id. at 699-700.) The court excused Ms. Harden for cause, but the reason was not her views on the death penalty; she had expressed a concern that her performance as a juror might be affected because she would have to cancel a long-planned vacation to see her family if she were selected. (Id. at 718.)

Petitioner's counsel objected to her removal and argued that she had stated earlier in voir dire that having to cancel her trip would not affect her performance as a juror. (Id. at 718-19.) The defense asserted that her answers suggested that

she might be prone to vote for a life sentence and that the prosecutors were giving her an "easy out" with the vacation excuse. (Id. at 720.) Although the court initially gave credit to the defense's argument, it upheld the challenge because of the juror's demeanor and obvious anxiety about her vacation plans: "it's obvious to the Court that [her vacation] is paramount in her mind, and in observing her demeanor, and in the exercise of my discretion, I'm going to excuse her for cause over the objection of the defendant." (Id. at 722.) The defense moved for a mistrial. (Id.)

With each potential juror, the prosecution asked his or her beliefs regarding the death penalty and then meticulously explained the sentencing procedure. Having set out the process in detail, the prosecutor then asked whether the potential juror could follow the law. The prosecutor even encountered a prospective juror, Dawyer Gross, who had a strong opposition to the death penalty but repeatedly insisted that he would follow the law. (See id. at 2127-57.) Recognizing that the juror fit within the federal and state law juror standards, the prosecution used a peremptory strike to remove him instead of moving for cause. (Id.) When a juror seemed unclear on the process, the court clarified and made sure questioning proceeded under Witherspoon and Adams standards. (See, e.g., id. at 1732-

58 (in which court denies motion for cause after asking clarifying questions of a venire member who was unsure of his ability to vote for a death sentence).)

The Petitioner has not proven that the state court applied federal law unreasonably when it denied his juror-selection claims. A court may exclude any potential juror for cause when it determines that the venire member cannot serve fairly and impartially for any reason. See Turner v. Louisiana, 379 U.S. 466, 471 (1965) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." (citations omitted)). Petitioner has presented insufficient evidence that the trial court violated either Witherspoon or Adams in excusing any juror for cause and has certainly not shown that the state court applied either of these cases unreasonably. Ground Nine, therefore, is denied.

### 3. Ground Twenty-Two

Petitioner argues in Ground Twenty-Two that his trial counsel were constitutionally ineffective for failing to question jurors regarding their opinions on the death penalty in violation of Morgan v. Illinois, 504 U.S. 719 (1992), and failing to assert appropriate challenges to strikes under Batson v. Kentucky, 476 U.S. 79 (1986). (Doc. 2 at 24.) He again alleges that the trial court constructively denied him counsel,

which prevented his counsel from presenting all of the arguments they should have as effective counsel. (Doc. 10 at 63.)

In _Morgan_, the Supreme Court reversed an Illinois Supreme Court decision that held that a trial court may refuse to ask prospective jurors whether they would automatically vote for a death sentence. _Morgan_, 504 U.S. at 729. The Court ruled that, to sustain a defendant's right to an impartial jury, a court must ensure "an adequate voir dire to identify unqualified jurors." _Id._ Following the rulings of _Witherspoon_, _Wainwright_, and _Adams_, a court must take care to see that a jury is "life-qualified," as well as "death-qualified": "Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death after conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would _never_ do so." _Id._ at 732-34. It follows that the trial court has the responsibility either to question the venire itself or to allow defense questioning to prevent the empaneling of a biased or partial jury.

_Batson_ seeks to prevent racial discrimination in jury selection. If an attorney uses peremptory strikes in what seems to be a racially-discriminatory manner, opposing counsel may

object on the basis of Batson. Batson, 476 U.S. at 96. The

defendant must make a prima facie showing that the circumstances

surrounding the strike raise an inference that the prosecution

struck the prospective juror because of his or her race. Id. The

burden then shifts to the prosecutor to present a

non-discriminatory reason for the strike. Id. The defendant may

present evidence that the reason is merely pretext for racial

discrimination. Id. at 98. Ultimately, the burden rests on the

defendant to prove by a preponderance of the evidence that the

prosecution struck the venire member with discriminatory intent.

Id.

As discussed in the analysis of Grounds Eight and Nine, the

State MAR court extensively reviewed the transcripts of jury

selection to address each of the juror-selection claims. In

addressing the juror Petitioner identified as "the best example

of a missed Batson claim," the state court quoted the portions

of the transcript where potential juror Gross stated that he had

always been a strong opponent of the death penalty and that he

would be "very reluctant" to vote for a death sentence. (First

MAR Order (Doc. 162-4) at 107.) The court determined that

Petitioner did not meet the prejudice requirement of Strickland

in challenging his counsel's effectiveness for not making a

Batson challenge to the strike. (Id. at 111.) The court found

any notion that a <u>Batson</u> challenge could be sustained to be "completely groundless," given the number of race-neutral reasons the prosecution could have used for striking Gross. (<u>Id.</u>) The court pointed to his age (81), the fact that he held a Ph.D. in religion, and his position as a Baptist minister who had always held strong beliefs in opposition to the death penalty. (<u>Id.</u>)

Petitioner cannot show that the State court unreasonably applied <u>Strickland</u> because he cannot demonstrate prejudice, or a reasonable likelihood that had counsel properly questioned jurors or objected to challenges made by the prosecution, the result of his trial would have been different. The State court found no <u>Morgan</u> or <u>Batson</u> violations. The jury selection transcripts reveal that defense counsel questioned prospective jurors on their death-penalty opinions to the extent the trial court allowed them following extensive questioning on the same by both the prosecutor and the court. When the trial court did not allow questions from defense counsel, it questioned the jurors to ensure that any potential juror who would automatically vote for the death penalty was excused for cause.

Although the defense made no <u>Batson</u> objections, Petitioner suffered no prejudice because he cannot prove that the prosecution violated <u>Batson</u> with any of its peremptory strikes.

The prosecution used thirteen peremptory strikes to remove prospective jurors. Of these strikes, seven were venire members who either opposed or were ambivalent toward the death penalty. Of the remaining six, the prosecution had legitimate, non-discriminatory reasons to excuse them all. A race-neutral reason need not be "persuasive, or even plausible," Purkett v. Elem, 514 U.S. 765, 768 (1995), as long as it is "clear, sufficiently specific and related to the particular case to be tried." Kandies v. Polk, 385 F.3d 457, 473 (2004), vacated on other grounds by Kandies v. Polk, 545 U.S. 1137 (2005). Facing no Batson objections, the prosecution was not required to articulate race-neutral reasons for its strikes. This court, however, can easily find such reasons.[10] In addition to the potential juror struck presumably because of their tepid support for the death penalty, Juror Cooke had previously employed defense counsel to represent her son, (Jury Selection Tr. at 416); Juror King was connected to Lisa Bridges through his father's dating of her son's father's girlfriend, and multiple family members had been convicted of drug charges in Alamance and surrounding counties, (id. at 617, 626-28); Juror Giffis

---

[10] Neither the Petitioner nor the Respondent has provided the court with a racial breakdown of the venire, so the court will proceed as if every strike by the State required an explanation under Batson.

expressed confusion about the concepts of circumstantial evidence and the burden of proof and stated that he could not convict anyone on circumstantial evidence alone, (id. at 725); Juror Riley was very nervous about what a lengthy trial might do to his job status, (id. at 1549); Juror Belton was very combative with the prosecution, knew some members of Bridges' family, and had already formed an opinion about the case, (id. at 2698); and Juror Nachborn had recently served on a criminal jury and admitted to a fellow venire member that he had read about the case in the newspaper, (id. at 2825). Although each of these prospective jurors stated that they did not believe that their individual experiences and opinions would impact their performance as jurors, their voir dire answers would have provided multiple legitimate non-discriminatory reasons for the prosecution to excuse them. With no prejudice resulting from any alleged error by trial counsel, Petitioner has not proven IAC or that the state court unreasonably applied any clearly established federal law.

Because Petitioner did not present the Cronic claim embedded in Ground Twenty-Two to the state court, it is not exhausted. The court therefore denies this Cronic claim as procedurally defaulted. With no merit as a Batson or a Cronic claim, Ground Twenty-Two is denied.

**F.    Ground Ten: Excluded Social Services Records**

In Ground Ten, Petitioner asserts that the trial court
erroneously and prejudicially excluded evidence regarding
supervision of Bridges and her family by Social Services
following Susie's death. Petitioner claims that the exclusion of
the evidence violated his constitutional rights to confrontation
and to present a defense. (Doc. 2 at 18.) He insists that, had
his counsel not been ineffective, he could have used these
records to build a defense surrounding Bridges' inability to
parent her children and assert an alternative cause for Susie's
death. (Doc. 10 at 56.) He claims that Pennsylvania v. Ritchie,
480 U.S. 39 (1987), supports this argument. (Doc. 10 at 56.)
Respondent distinguishes Ritchie by pointing out that in that
case, the records at issue had not been examined by the trial
court. (Doc. 11 at 43.) In Petitioner's case, both trial counsel
and the court reviewed the Social Services file before the court
excluded it as evidence. (Id.)

The state supreme court rejected this claim. Burr, 341 N.C.
at 293, 461 S.E.2d at 618. The court considered that the records
at issue were not relevant because they contained no evidence of
abuse by Bridges and thus did not point directly to her guilt.
Id. Furthermore, the Department of Social Services closed the
file on Bridges after a year of supervision, and, during trial,

Petitioner had access to similar records with which he could impeach Bridges and impugn her parenting ability. Id. at 293-94, 461 S.E.2d at 618. The state MAR court concluded, in the context of Petitioner's IAC claim, that Petitioner's counsel had sought and received similar evidence prior to trial and thus did not perform ineffectively. (First MAR Order (Doc. 162-4) at 81-82.)

A federal habeas court will not review a state court's ruling on the admissibility of evidence unless that evidence violates specific constitutional provisions or renders the trial a denial of due process. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Petitioner has not proven that his lack of access to these materials prejudiced him to the extent that it violated his right to confrontation or to present a defense. The state supreme court was not unreasonable when it concluded that the records would have merely been cumulative of the evidence Petitioner had presented to impeach Bridges and point suspicion at her at trial. The excluded records included information that Bridges had some trouble managing her schedule, keeping appointments, and maintaining a clean home. Burr, 341 N.C. at 293, 461 S.E.2d at 618. None of these facts would have assisted Petitioner in pointing the finger at Bridges, and their impeachment value was low given the similar evidence presented

at trial. Petitioner has pointed to no additional evidence in the records to assist his argument.

Ritchie does not help Petitioner. That case holds that due process requires a trial court to review in camera social services files to determine whether they might be material to the determination of guilt. Ritchie, 480 U.S. at 41. The court, not the defendant, holds the responsibility with regard to this type of material: "A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search the State's files and make the determination as to the materiality of the information." Id. Petitioner's trial court made such an in camera review and determined the records to be immaterial. Petitioner has given this court no reason to second-guess that determination. Ground Ten is denied.

### G. **Prosecutorial Misconduct**

Petitioner makes several claims that the prosecutor in his case made improper arguments to the jury that so infected his trial with unfairness as to deprive him of due process. Grounds Eleven, Thirteen, Fourteen, and Sixteen are all subject to the standards set forth in Darden v. Wainwright, 477 U.S. 168 (1986), and Donnelly v. DeChristoforo, 416 U.S. 637 (1974), regarding argument and the guarantee of due process under the Fifth and Fourteenth Amendments.

Although "prosecutors enjoy considerable latitude in presenting arguments to a jury," prosecutorial misconduct may implicate a defendant's due-process right to a reliable sentence. Bates v. Lee, 308 F.3d 411, 422 (4th Cir. 2002). Donnelly sets forth the basic principle for evaluating the impropriety of a prosecutor's actions: the conduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Darden created a two-pronged method for a reviewing court to use to determine whether (1) the prosecutor's conduct was improper, and (2) it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643). Darden concluded that a court may consider, for example, whether the prosecutor's argument manipulates or misstates the evidence or whether it implicates other specific rights of the accused. Id. at 182. The Fourth Circuit recommends a comprehensive look at the trial to determine whether a prosecutor's argument has rendered the trial constitutionally infirm: "In making this determination, we must look at 'the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated.'" Bennett v. Angelone, 92 F.3d 1336, 1345-

46 (4th Cir. 1996) (quoting <u>Lawson v. Dixon</u>, 3 F.3d 743, 755 (4th Cir. 1993)).

### 1.  **Ground Eleven**

Petitioner argues in Ground Eleven that the trial court erred by overruling Petitioner's objection to the prosecutor's improper suggestion that defense counsel were inferior lawyers because they failed to secure a specific witness to testify. (Doc. 2 at 19.) He asserts that the prosecutor's comments infected the trial with unfairness as prohibited by <u>Darden</u> and <u>Donnelly</u>.

In its rejection of this claim on direct appeal, the North Carolina Supreme Court quoted the portion of the prosecution's argument to which Petitioner vaguely refers in his Petition and supporting briefs. Nita Todd, a social worker at the hospital that initially received Susie, was unable to testify on the day the defense intended for her to take the stand. <u>Burr</u>, 341 N.C. at 297-98, 461 S.E.2d at 620-21. Instead, defense counsel read her report into evidence. <u>Id.</u>  In his closing argument, the prosecutor referred pointedly to her absence:

> By gum, ladies and gentlemen, I hope that I don't try
> a case, particularly one as serious as murder, that I
> don't talk to my witnesses and you, if any of you ever
> become victims to crime, which I hope you don't, but
> if any of you ever do, I think that you would hope
> that I or some other prosecuting attorney would talk
> to you and to your witnesses before taking your case

into the courtroom, because to do anything less would
be working an injustice to the victims.  You've got to
make arrangements to have your witnesses in the court
room sometimes. Now, I'll contrast that, if you will,
please, to the testimony of Nita Todd, excuse me, not
testimony, to the record of Nita Todd which was read
to you.

(Trial Tr. (Vol. 27) at 2217.) The trial court overruled the

defense's objection to this oblique attack on their efforts in

court. (Id. at 2218.) The state supreme court, after reviewing

the entire closing argument, determined that the prosecutor was

not taking a shot at defense counsel, but was instead attempting

"to minimize the effect of the evidence contained in the social

worker's report, which evidence may have contradicted the

testimony by the State's witnesses." Burr, 341 N.C. at 298, 461

S.E.2d at 621. Acknowledging the latitude generally allowed in

argument and considering the statement in the context of the

entire closing statement, the court concluded that, error or

not, the prosecutor's words did not "infect[] the trial with

unfairness" and therefore deny Petitioner due process. Id. at

299, 461 S.E.2d at 621.

Despite its generosity toward the prosecution's seeming

attack on defense counsel, the state court's determination was

not an unreasonable application of Darden or Donnelly. When read

in the context of the entire argument, the statement regarding

uncalled witnesses may have thrown shade at defense counsel, but

fair-minded jurists could disagree as to whether the undermining of Petitioner's attorneys was improper and so egregious as to infect the trial with unfairness or whether, as the state court found, it was intended simply to undermine the testimony read into the record. See Parker v. Matthews, 567 U.S. 37, 46-47 (2012) (reversing grant of habeas corpus after considering in the entire context of the argument prosecutor's suggestion that defendant colluded with counsel to manufacture affirmative defense to murder charge); Harrington, 562 U.S. at 102. Considering the evidence of Petitioner's guilt, the fact that opposing counsel called several witnesses and had Todd's testimony available to the jury, and the relative mildness of the remarks, this court cannot conclude that this portion of the prosecution's argument rendered Petitioner's entire trial unfair.

Petitioner has not proven that the prosecutor's statement concerning the defense's failure to secure Nita Todd's appearance in court denied him due process, and he certainly has not proven that the North Carolina Supreme Court's rejection of this claim was an unreasonable application of clearly established federal law. Ground Eleven, therefore, is denied.

## 2. **Ground Thirteen**

In Ground Thirteen, Petitioner claims that the trial court erred by allowing the prosecutor to argue outside of the record during the sentencing phase. Petitioner claims that the prosecutor committed misconduct when he used the facts of prior cases to guide the jury in determining whether Petitioner's crime was heinous, atrocious, or cruel, as required by the aggravating circumstance presented to the jury. (Doc. 2 at 20); see N.C. Gen Stat. § 15A-2000(e)(9) (making a defendant death-eligible if "[t]he capital felony was especially heinous, atrocious, or cruel"). To flesh out the (e)(9) aggravator, the prosecutor described to the jury some of the facts of previous cases in which jurors had found the aggravating factor. See Burr, 341 N.C. at 305, 461 S.E.2d at 625 (describing the alleged prosecutorial misconduct). The prosecutor referred to another case in which the defendant had killed an infant, State v. Huff, 325 N.C. 1, 381 S.E.2d 635 (1989), and one in which the defendant bludgeoned a woman with a cast-iron skillet, State v. Huffstetler, 312 N.C. 92, 322 S.E.2d 110 (1984). Id. In his closing argument, defense counsel also used the Huff case to distinguish that defendant's actions from Petitioner's. Id. at 308-09, 561 S.E.2d at 627.

Petitioner argued to the state supreme court that the prosecutor's use of these cases violated a state law prohibiting counsel from "read[ing] the facts contained in a published opinion together with the result to imply that the jury in his case should return a favorable verdict for his client." State v. Gardner, 316 N.C. 605, 611, 342 S.E.2d 872, 876 (1986). The supreme court rejected this claim, suggesting that the prosecution did not violate this rule and concluding nevertheless that such a violation would not have resulted in prejudice, given the "overwhelming evidence" that Petitioner's murder of Susie rose to the level of the (e)(9) aggravator. Burr, 341 N.C. at 307-08, 461 S.E.2d at 626-27.

In rejecting the claim that the prosecution's behavior was "grossly improper," the state court did not apply any clearly established federal law unreasonably.[11] It is not this court's place to rule on questions of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). To the extent that Ground Thirteen implicates federal due-process protection, the state court's conclusion that the prosecution presented overwhelming evidence to satisfy

---

[11] Because defense counsel did not object to this argument during sentencing, the state court reviewed under its "grossly improper" standard. Burr, 341 N.C. at 305, 461 S.E.2d at 625.

the (e)(9) aggravator is informative. Susie suffered two broken arms and two broken legs, she had bruising on her jaw in the shape of a hand, and she died because of swelling in her brain caused by a depressed skull fracture. Burr, 341 N.C. at 308, 461 S.E.2d at 626-27. A hard strike with a blunt object caused the skull fracture, meaning Petitioner either hit Susie in the head with great force or smashed her head against something. Id. Susie was a months-old baby toward whom Petitioner had at least some parental duties. Id. The evidence in the case was sufficient for the jury to conclude that the murder was "especially heinous, atrocious, or cruel." N.C. Gen. Stat. § 15A-2000(e)(9). The prosecution's reference to the facts of other (e)(9) cases in an effort to clarify the definition of the aggravator did not rise to a level that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. The state court made no error in rejecting this claim. Ground Thirteen is denied.

### 3.   Ground Fourteen

Petitioner argues in Ground Fourteen that the trial court violated his constitutional rights to a fair and reliable sentencing hearing when it overruled Petitioner's objection to the prosecutor's argument regarding the injuries inflicted on Susie. (Doc. 2 at 20.) Petitioner claims that the prosecutor

misstated the order in which Susie received the injuries leading to her death. The prosecutor said in argument, "I don't know when that was done, [the injuries to [Susie]'s ears], but I would submit to you [the injuries were] probably done prior to the time before the final blow that struck to [sic] her head." Burr, 341 N.C. at 309, 461 S.E.2d at 627. Petitioner insists that this error amplified the evidence for the (e)(9) aggravator and thus "so infected the trial with unfairness as to make the resulting decision a denial of due process," in violation of Darden and Donnelly. (Doc. 10 at 59.) The state supreme rejected this claim as harmless error because of the overwhelming evidence that Susie's murder was especially heinous, atrocious, or cruel. Burr, 341 N.C. at 309, 461 S.E.2d at 627.

The state court's ruling was not contrary to or an unreasonable application of Donnelly and Darden. The extent of Susie's injuries justified the jury's conclusion that her murder was especially heinous, atrocious, or cruel. Whether her ears were bruised before or after her skull fracture matters little in the face of evidence of her multiple bruises, broken bones, and the loss of the majority of her blood volume. Furthermore, Susie lived for nearly a full twenty-four hours after the doctors discovered the bruises on her ears. If the prosecutor misstated the facts about the order in which Susie suffered her

myriad injuries, the trial court's failure to sustain the defendant's objection was indeed harmless. Removing that statement from the jury's consideration would have had little effect on their decision about the (e)(9) aggravator. Ground Fourteen, therefore, is denied.

### 4. **Ground Sixteen**

In Ground Sixteen, Petitioner alleges that the trial court erred by failing to prevent the prosecutor from misstating the law regarding the aggravating factor that the crime was "especially heinous, atrocious, or cruel" in his closing argument. (Doc. 2 at 21.) In his post-Fourth-Circuit brief, Petitioner attempts to clarify this argument, stating that the court failed to account for the possibility that, under North Carolina law, non-unanimity on aggravating factors and whether they outweigh mitigating circumstances can result in a life sentence as the verdict. (Doc. 163 at 14-15.) Petitioner may or may not have presented this interpretation of Ground Sixteen to the state court. Nonetheless, Petitioner claims that the prosecutor's argument so infected his trial as to deny him due process. (Doc. 10 at 60.) The state supreme court concluded that Petitioner could not have shown prejudice even if the prosecutor had misstated the law based on its reasoning in rejecting the

claim Petitioner made in Ground Thirteen. <u>Burr</u>, 341 N.C. at 310, 461 S.E.2d at 628.

No matter the precise thrust of Ground Sixteen, Petitioner has not proven that the state court applied federal law unreasonably or even erred when it ruled that Petitioner's claim that the prosecution misstated the law regarding the (e)(9) aggravator failed for a lack of prejudice. The court ruled that the prosecution had proven the aggravating factor with copious evidence, and this court finds no fault with that ruling, as explained in the Ground Fourteen subsection. Furthermore, Petitioner concedes that the Supreme Court of the United States has rejected his argument about the weighing of aggravators and mitigators and unanimity of the verdict. (Doc. 163 at 15, citing <u>Kansas v. Marsh</u>, 548 U.S. 163, 173 (2006).)[12] Ground Sixteen is denied.

###    H.   Ground Twelve: Bridges Medical Records

Ground Twelve asserts that the trial court erred by failing to order that medical and psychiatric records concerning Bridges be admitted into evidence. (Doc. 2 at 19.) Petitioner's trial counsel did not subpoena these medical records, so the North Carolina Supreme Court was unable to review them on appeal and

---

[12] It is debatable whether Petitioner has exhausted this claim, but the Supreme Court's rejection of it nonetheless guarantees its failure.

rule on the claim. <u>Burr</u>, 341 N.C. at 302, 461 S.E.2d at 623;

(Doc. 10 at 57). Petitioner does not argue what these records

would have proven had they been obtained and admitted. (Doc. 10

at 57-58.) Respondent claims that this ground is procedurally

defaulted pursuant to the state procedural rule that required

Petitioner to submit the records to the North Carolina State

Court for appellate review. (Doc. 11 at 45.)

"A federal habeas court may not review a claim when a state

court has declined to consider its merits on the basis of an

independent and adequate state procedural rule." <u>Bacon v. Lee</u>,

225 F.3d 470, 476 (4th Cir. 2000); <u>see</u> <u>Coleman</u>, 501 U.S. at 750

(defining the federal habeas court's rule vis-à-vis claims that

have been procedurally barred in state courts). An independent

and adequate state procedural rule must not "depend[ ] on a

federal constitutional ruling," <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75

(1985), and must be "firmly established and regularly followed."

<u>James v. Kentucky</u>, 466 U.S. 341, 348 (1984). A federal habeas

court may only determine whether the state law is independent

and adequate, not "whether the state court correctly applied its

own law." <u>Williams v. French</u>, 146 F.3d 203, 209 (4th Cir. 1998).

A federal habeas court may only review a procedurally barred

claim if the petitioner shows legitimate cause for the default

and actual prejudice resulting from it. <u>Maples v. Thomas</u>, 565

U.S 266, 280-81 (2012); <u>McCarver v. Lee</u>, 221 F.3d 583, 591-92 (4th Cir. 2000).

Petitioner has procedurally defaulted Ground Twelve. North Carolina's rule regarding the competition of a record for appeal is a fundamental rule that allows the reviewing state court to have an adequate basis on which to rule. N.C. Rule App. P. 9, 10(a). As state rules governing appellate procedure, Rules 9 and 10 do not rely on any federal law or constitutional ruling, making them independent under <u>Coleman.</u> A review of North Carolina cases reveals that the North Carolina Supreme and Appellate Courts rely on this rule regularly, dismissing claims and cases in both civil and criminal court where appellants have not included the necessary documents in their record of appeal. <u>See</u> <u>State v. Alston</u>, 307 N.C. 321, 341, 298 S.E.2d 631, 644–45 (1983) ("It is the appellant's duty and responsibility to see that the record is in proper form and complete. . . . Since the motion is not before this Court, the defendant's assignment of error amounts to a request that this Court assume or speculate that the trial judge committed prejudicial error in his ruling."); <u>State v. Williams</u>, 274 N.C. 328, 333, 163 S.E.2d 353, 357 (1968) ("An appellate court is not required to, and should not, assume error by the trial judge when none appears on the record before the appellate court."); <u>State v. Dobbs</u>, 234 N.C.

560, 67 S.E.2d 751 (1951) (holding that when a necessary part of the record has been omitted, the appeal will be dismissed); State v. Martin, ____ N.C. App. ____, 836 S.E.2d 789, 2020 WL 70711, at *2 (2020) ("Nothing in the record shows the trial court ever docketed Defendant's monetary obligations or court costs as a civil judgment, and without that necessary part of the record we must dismiss Defendant's appeal as it relates to this issue."); State v. Moss, ____ N.C. App. ____, 824 S.E.2d 925, 2019 WL 1283815, at *12 (2019) ("This Court is precluded from addressing alleged error in the prosecutor's argument unless a defendant provides a transcript of the argument in question."); State v. Harvell, 45 N.C. App. 243, 246, 262 S.E.2d 850, 852 (1980) ("When a necessary part of the record has been omitted, the appeal will be dismissed."). In particular, a court will not review a claim regarding excluded evidence if the appellant does not include the evidence in the appellate record:

[I]t is well established that

> [t]he exclusion of evidence will not be
> reviewed on appeal unless the record
> sufficiently shows what the evidence would
> have been. In order for a party to preserve
> for appellate review the exclusion of
> evidence, the significance of the excluded
> evidence must be made to appear in the
> record and a specific offer of proof is
> required unless the significance of the
> evidence is obvious from the record.

Discover Bank v. Rogers, No. COA19-217, 2019 WL 6876711, at *3
(N.C. Ct. App. Dec. 17, 2019) (citations omitted).

Petitioner offers no argument that the state courts do not
regularly apply this rule or that it depends on federal law. He
has not also shown cause for his failure to present the Bridges'
records to the court on direct appeal. Ground Twelve, therefore,
is denied.

### I.    Jury Instruction Claims

#### 1.    Ground Fifteen

Petitioner asserts that the trial court's jury instruction
on the aggravating circumstance that the murder was "especially
heinous, atrocious, or cruel," N.C. Gen. Stat. § 15A-2000(e)(9),
failed to limit the application of the aggravating circumstance,
which Petitioner claims is unconstitutionally vague on its face.
(Doc. 2 at 21.) The instruction, he claims, violated the
limitations on death sentencing set by Godfrey v. Georgia, 446
U.S. 420 (1980). (Doc. 10 at 59.) According to Petitioner, it
"fails to sufficiently define and narrow this circumstance,"
creating a "vague and arbitrary standard." (Doc. 163 at 11.)

The North Carolina Supreme Court reviewed this claim for
plain error because Petitioner did not object to the instruction
at trial. Burr, 341 N.C. at 310, 461 S.E.2d at 627. Regardless
of the standard of review, the court saw no reason to reexamine

its holding in State v. Syriani, 333 N.C. 350, 391-92, 428 S.E.2d 118, 140-41, which upheld as constitutional an identical instruction given defining the (e)(9) aggravator. Id.

A state must ensure that its capital-sentencing scheme prevents the imposition of the death penalty in an arbitrary and capricious manner. Furman v. Georgia, 408 U.S. 238, 309-10 (1972) (Stewart, J., concurring); Fisher v. Lee, 215 F.3d 438, 457 (4th Cir. 2000). Aggravating circumstances must narrow the category of defendants made eligible for a death sentence to "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." Godfrey, 446 U.S. at 428 (footnotes, citations and quotation marks omitted). "A statutory circumstance that is alone too vague to provide meaningful guidance to the sentencer may be accompanied by a limiting instruction which does provide sufficient guidance." White v. Lee, No. 00-3, 2000 WL 1803290, at *5 (4th Cir. Dec. 8, 2000). The North Carolina Supreme Court has ruled that the (e)(9) aggravator plus the pattern jury instruction given in Petitioner's case provide to the jury constitutionally sufficient guidance to narrow the category of defendants subjected to the penalty. Syriani, 333 N.C. at 391-92, 428 S.E.2d at 141.

Petitioner's argument does not convince this court that the state court's reliance on its rulings in <u>Syriani</u> and subsequent cases unreasonably applies clearly established federal law. Petitioner insists that the only way to make the (e)(9) aggravating circumstance constitutionally tailored would be a jury instruction that "incorporate[s] all of the narrowing factors necessary to cure the inherent vagueness" of the circumstance and cites several cases that have used different narrowing instructions. (Doc. 163 at 12-13.) The Constitution, however, does not require that an instruction present every type of narrowing option; it must simply provide "clear and objective standards" and "specific and detailed guidance" to the jury. <u>Godfrey</u>, 446 U.S. at 428. The narrowing portion of North Carolina's pattern jury instruction states: "For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing, or this murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim." N.C.P.I. Crim. 150.10 at 18-19 (1992). Combined with the definition the instructions provides — "heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree a pain with utter indifference to, or even

enjoyment of, the suffering of others," id. — the instruction certainly narrows the class of murder-committing defendants eligible for the death penalty. In addition, the instruction is further limited by a requirement of "unnecessarily torturous to the victim." Petitioner has not convinced this court that the state court's approval of the instruction has unreasonably applied any federal law considering the constitutionality of aggravating circumstances and their accompanying jury instructions. Ground Fifteen is denied.

### 2. Ground Seventeen

Ground Seventeen alleges that the trial court erred by failing to instruct the jury properly on the inherent mitigating value of the mitigating factor regarding Petitioner's ability to adjust to life in prison, in violation of the Eighth and Fourteenth Amendments. (Doc. 10 at 60.) Petitioner claims that the court improperly stated that the jury could reject this mitigating circumstance and that the state supreme court's rejection of the claim was an unreasonable application of Skipper v. South Carolina, 476 U.S. 1, 7 (1986). (Id.)

The state supreme court ruled that it had recently decided against an identical claim in State v. Basden, 339 N.C. 288, 451 S.E.2d 238 (1994). Burr, 341 N.C. at 311, 461 S.E.2d at 628. The state court interpreted Skipper to mean that a court may not

prevent a defendant from presenting to the jury evidence of his or her good behavior in jail as a mitigating circumstance. <u>Id</u>. The court concluded that the trial court fulfilled its duty under <u>Skipper</u> by allowing Petitioner to present the evidence; the question of whether the jury deemed that evidence to have mitigating value did not implicate the right protected by <u>Skipper</u>. <u>Id</u>.

In <u>Skipper</u>, the Supreme Court relied on its decisions in <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978), and <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982), that a defendant facing a death sentence must be allowed to place "relevant mitigating evidence" before the sentence. <u>Skipper</u>, 476 U.S. at 4. <u>Eddings</u> state that "'the sentencer [should] not be precluded from considering, <u>as a mitigating factor</u>, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" <u>Eddings</u>, 455 U.S. at 110 (quoting <u>Lockett</u>, 438 U.S. at 604). Based on this principle, the Court concluded that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." <u>Skipper</u>, 476 U.S. at 5. A trial court, therefore, may not exclude good jail-behavior evidence from a jury. <u>Id</u>.

The North Carolina Supreme Court's ruling was not an unreasonable application of Skipper. Skipper requires a trial court to allow a defendant to present relevant potentially mitigating evidence to the jury. Skipper says nothing about requiring the jury to award such evidence mitigating value. The North Carolina legislature has chosen to empower some mitigating circumstances with mitigating value if the defendant has evidence to support them. N.C. Gen Stat. § 15A-2000(f)(1)-(8). These "statutory mitigating circumstances" are different from the non-statutory catch-all circumstances (grouped under subsection (f)(9)), for which the jury must decide whether they have value or not. This legislative scheme does not run afoul of Skipper. Ground Seventeen is denied.

### 3.   Ground Eighteen

In Ground Eighteen, Petitioner claims that the "trial court improperly instructed the jury that each juror could reject non-statutory mitigating circumstances on the basis that they did not find the circumstances mitigating." (Doc. 2 at 22.) He argues that this instruction violated his Eighth and Fourteenth Amendment rights and that the state supreme court's rejection of the claim was an unreasonable application of Eddings v. Oklahoma, 455 U.S. 104 (1982). (Doc. 10 at 61.) The North Carolina Supreme Court relied on its previous rulings in

summarily rejecting this claim. <u>Burr</u>, 341 N.C. at 311-12, 461 S.E.2d at 628-29.

As stated in the above discussion of Ground Eighteen, <u>Eddings</u> requires that a defendant must be allowed to present any relevant mitigating evidence to the sentence. <u>Eddings</u>, 455 U.S. at 110. <u>Eddings</u> does not require the sentence to give value to any mitigating circumstance; it guarantees that evidence supporting the circumstance not be withheld from the sentencer. <u>Id</u>. The state court's rejection of this claim was not unreasonable. The court denies Ground Eighteen.

### 4. __Ground Nineteen__

In Ground Nineteen, Petitioner asserts that the trial court improperly instructed jurors regarding the method for weighing mitigating circumstances for each crime for which he was charged. (Doc. 2 at 23.) Petitioner claims that the use of the word <u>may</u> in jury instructions allowed jurors to use their own discretion in determining whether to give proven mitigating circumstances mitigating value, in violation of <u>Boyde v. California</u>, 494 U.S. 370 (1990). (Doc. 10 at 61-62.) Petitioner argues that this instruction may have "prevented consideration of constitutionally relevant evidence." (<u>Id.</u> at 62.) The state supreme court's rejection of this claim, according to Petitioner, violated the Fifth, Six, and Fourteenth Amendments

and was an unreasonable application of <u>Boyde</u> and <u>McKoy v. North Carolina</u>, 494 U.S. 433 (1990). (<u>Id.</u>) The North Carolina Supreme Court summarily rejected this claim as identical to others decided in its previous rulings. <u>Burr</u>, 341 N.C. at 311, 461 S.E.2d at 628.

Neither <u>Boyde</u> nor <u>McKoy</u> help the Petitioner. <u>Boyde</u> reminds courts that "[t]he Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner," which means that a court may not "restrict impermissibly a jury's consideration of relevant evidence." <u>Boyde</u>, 494 U.S. at 377-78. To evaluate whether an instruction has done so, the Court has determined that "the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." <u>Id</u>. at 380. A court must not "engage in a technical parsing" of an instruction, but rather must evaluate it "with a commonsense understanding of the instructions in the light of all that has taken place at the trial." <u>Johnson v. Texas</u>, 509 U.S. 350, 368 (1993) (quotation marks omitted). The court had instructed the jurors that they were required to weigh any mitigating circumstance they found to exist against the aggravating circumstances. A commonsense interpretation of the

entire instruction makes it highly unlikely that the use of the word _may_ in a subsequent sentence undermined the jury's understanding that they were required to give the mitigating circumstances they found proper consideration. The Fourth Circuit, in an unpublished opinion, has found that the North Carolina Supreme Court's acceptance of these instructions was not an unreasonable interpretation of clearly established federal law. Carter v. Lee, No. 99-10, 1999 WL 1267353, *8 (4th Cir. Dec. 29, 1999) ("That the trial court used the word 'may' instead of the word 'must' — as Carter would have preferred — does not create a reasonable likelihood that the jury misunderstood its task."). This court agrees. Ground Nineteen is denied.

### J.    __Ineffective Assistance of Counsel Claims__

To prove IAC, a petitioner must establish both that trial counsel's performance fell below a reasonable standard for defense attorneys and that performance prejudiced the petitioner. Strickland v. Washington, 466 U.S. 668 (1984) (adopted in North Carolina by State v. Braswell, 312 N.C. 553, 324 S.E.2d 241 (1985)). The petitioner bears the burden of affirmatively showing deficient performance. Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). An analysis of counsel's performance begins with the assumption that counsel "rendered

adequate assistance and made all significant decisions in the
exercise of reasonable professional judgment." Strickland, 466
U.S. at 690. To overcome that presumption and establish
deficient performance, a petitioner must show "that counsel
failed to act 'reasonabl[y] considering all the circumstances.'"
Cullen, 563 U.S. at 189 (quoting Strickland, 466 U.S. at 688).
To establish prejudice, the petitioner must show that there is
"a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different."
Strickland, 466 U.S. at 694.  A court is not required to
"address both components of the inquiry if the defendant makes
an insufficient showing on one." Id. at 697.

### 1.  **Ground Twenty**

Petitioner states in his petition that North Carolina's
death penalty procedure is cruel and unusual and that the death
penalty statute is both vague and overbroad. (Doc. 2 at 23.) He
further asserts that the jury imposed the death sentence in his
case in an arbitrary and capricious manner based on sex, race,
and poverty. (Id.) In the brief supporting his petition,
however, Petitioner claims that his constructive denial of
counsel made his conviction and sentence unreliable. (Doc. 10 at
62.) He relies on Cronic to support this claim.

The state supreme court rejected this claim when Petitioner presented it on direct appeal as simply an attack on the constitutionality of North Carolina's death penalty statute. Standing on its previous rulings on the same claim in other cases, the state court upheld its prior rulings and denied the claim. Burr, 341 N.C. at 312, 461 S.E.2d at 629. In these prior cases, the state court evaluated the statute under the standards set forth by Gregg v. Georgia, 428 U.S 153 (1976). For a death-penalty statute to accord with the standards of the Eighth Amendment, it must not be excessive and not be grossly out of proportion to the severity of the crime. Gregg, 428 U.S. at 173; Coker v. Georgia, 433 U.S. 584, 592 (1977). Furthermore, a death penalty statute must "narrow the class of murderers subject to capital punishment," Gregg, 428 U.S. at 196, by providing "specific and detailed guidance to the sentencer," Proffitt v. Florida, 428 U.S. 242, 253 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). The North Carolina Supreme Court has held its statute up to these standards multiple times and has found it to be constitutional.

To the extent that this claim relies on a Cronic claim of constructive denial of counsel, Petitioner has not presented this ground to the state courts. It is therefore not exhausted and procedurally defaulted. Without the underlying Cronic claim,

the state court's decision was not an unreasonable application of clearly established federal law. If a person has been convicted of first-degree, premeditated and deliberate murder in North Carolina, that person may only be eligible for the death penalty if a jury finds beyond a reasonable doubt that the murder was committed in the context of one of eleven specified aggravating circumstances. N.C. Gen. Stat. § 15A-2000. A jury must then consider multiple statutory and non-statutory mitigating circumstances, which may be found by a preponderance of the evidence, and weigh them against the aggravating circumstances. Id. Only if the jury finds beyond a reasonable doubt that the mitigating circumstances do not outweigh the aggravating circumstances, may the jury then recommend a death sentence. Id. The Supreme Court has not held this scheme to be unconstitutional. The trial court in Petitioner's case followed the statutory requirements to arrive at his sentence. The state court, therefore, was not unreasonable when it ruled that the capital sentencing scheme in North Carolina did not violate the United States Constitution. The court denies Ground Twenty.

### 2. __Ground Twenty-One__

In Ground Twenty-One, Petitioner claims that his trial counsel were ineffective for failing to submit various pre-trial motions to allow them access to experts who might interpret the

medical evidence in Petitioner's case. (Doc. 2 at 24.) He insists that he was constructively denied the assistance of counsel by the trial court's decisions and relies again on Cronic. (Doc. 10 at 63.)

The State MAR court denied this claim on its merits. The court first pointed out that counsel is not automatically considered deficient under Strickland for failing to acquire the assistance of a medical expert. (First MAR Order (Doc. 162-4) at 77-78.) The court then detailed its conclusions that trial counsel prepared adequately for the trial and had considerable experience in defending against serious charges and in matters relating to child abuse. (Id. at 79.) The court determined that Petitioner did not show either deficient performance or prejudice, given its rejection of Petitioner's proffered evidence from his post-conviction medical experts. (Id.) The court similarly rejected all of Petitioner's other claims based on counsel's alleged pretrial failures. (Id. at 79-84.)

To the extent that Petitioner relies on the constructive denial of counsel as the basis of this claim, Ground Twenty-One has not been exhausted and is procedurally defaulted. Likewise, his claim of ineffective assistance of counsel under Strickland fails because the Fourth Circuit has already decided that his counsel did not perform deficiently in their preparation for

trial, and Petitioner did not suffer prejudice as a result of their performance. Burr, 513 F. App'x at 342, 344, 345. Petitioner's Strickland claim in this ground for relief is that his counsel were not prepared for trial and failed to do the things in preparation that reasonable counsel would have done. This argument is essentially the same argument Petitioner originally pursued in Grounds One, Two, and Three — his counsel were not prepared for trial and failed to develop exculpatory evidence with the help of a medical expert, and the trial court failed to allow them to prepare for trial — which the Fourth Circuit ruled against, finding that the state MAR court's rejection of them was not an unreasonable application of clearly established federal law. For these reasons, Ground Twenty-One is denied.

### 3. <u>Ground Twenty-Three</u>

In Ground Twenty-Three, Petitioner argues that defense counsel's failure to hire a medical expert was constitutionally ineffective because counsel was thus prevented from developing an alternative explanation for Susie's death, which would have been strong mitigating evidence. (Doc. 2 at 25.) The constructive denial of counsel by the trial court prevented Petitioner's counsel from presenting the mitigation case it

should have. (Doc. 10 at 64.) The State MAR court denied this claim on the merits. (First MAR Order (Doc. 162-4) at 113.)

Ground Twenty-Three, to the extent that it relies on the Cronic claim of constructive denial of counsel, has not been exhausted and is procedurally defaulted. Presented as a Strickland ineffective assistance of counsel claim, this ground did not survive the Fourth Circuit's scrutiny. Burr, 513 F. App'x at 342-45. Petitioner argued in Ground One that "trial counsel were constitutionally ineffective [for] failing to develop exculpatory evidence of accidental death." (Doc. 10 at 21). Developing this evidence, according to Petitioner, would have required hiring a medical expert. Ground Twenty-Three, therefore, asserts a portion of the claim that Ground One asserts and is denied as res judicata.

### K.  Ground Twenty-Four: Short-Form Indictment

Ground Twenty-Four asserts that the indictment the State used failed to allege all of the elements of the crime of first-degree murder, as well as the aggravating circumstance upon which the State planned to seek the death penalty. (Doc. 2 at 25.) Failure to include all of the elements of first-degree murder in the indictment violates a rule emphasized in Jones v. United States, 526 U.S. 227 (1999). (Doc. 10 at 66.) According to Petitioner, failure to include in the indictment all of the

essential elements of the crime plus anything that may increase the penalty to a death sentence, such as an aggravating circumstance, violates the due process clause of the United States Constitution. Apprendi v. New Jersey, 530 U.S. 466 (2000); (Doc. 10 at 67.)

The state MAR court denied this claim on the merits. (Second MAR Order (Doc. 162-4) at 175.) It noted a recent ruling by the North Carolina Supreme Court that rejected the same claim Petitioner made regarding the short-form indictment. (Id.) In State v. Wallace, 351 N.C. 481, 528 S.E.2d 326 (2000), the court pointed out that the Supreme Court of the United States had never ruled that the Fourteenth Amendment required states to charge every element of the crime in the indictment. Wallace, 351 N.C. at 508, 538 S.E.2d at 343. It further held that the Court had "specifically declined to apply the Fifth Amendment requirement of indictment by grand jury to the states via the Fourteenth Amendment." Id. The state court concluded in Wallace that Jones therefore did not apply to state courts. Bound by Wallace, the state MAR court rejected this claim. (Second MAR Order (Doc. 162-4) at 176.)

Prisoners in North Carolina have been challenging the short-form indictment since the Court ruled in Apprendi. Unfortunately, their reliance on Apprendi does not aid their

efforts. Jones, which ruled that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt," was a federal criminal case. Jones, 526 U.S. at 243 n.6. In Apprendi, the Court did not extend the indictment rule to the states. Instead, Apprendi held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. The Court conspicuously left out the Jones rule regarding indictments, and Petitioner may not rely on Apprendi to support his argument that North Carolina's short-form indictment is constitutionally flawed. The North Carolina Supreme Court has repeatedly found the short-form indictment to be constitutionally sufficient. See, e.g., State v. Braxton, 352 N.C. 158, 531 S.E.2d 428 (2000), cert. denied, 531 U.S. 1130 (2001); State v. Davis, 353 N.C.1, 539 S.E.2d. 243 (2000), cert. denied, 534 U.S. 839 (2001). Furthermore, Apprendi does not apply retroactively to habeas-corpus cases. United States v. Sanders, 247 F.3d 139 (4th Cir. 2001). The state court's rejection of this claim was therefore not contrary to or an unreasonable application of clearly established federal law. Ground Twenty-Four is denied.

## III. **CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that the Petitioner's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, (Doc. 2), is **DENIED** and that this action is dismissed with prejudice. A judgment dismissing this action will be entered contemporaneously with this Memorandum Opinion and Order. Finding no substantial issue for appeal concerning the denial of a constitutional right affecting the conviction, nor a debatable procedural ruling, a certificate of appealability is not issued.

This the 26th day of March, 2020.

_____
United States District Judge